## FORD vs. THE STATE.

1. TRANSCRIPT IN CRIMINAL CASE: *Must show impanneling of grand jury, etc.*
The entries showing the impanneling of the grand jury and their return of the indictment into court, are parts of the record in every criminal case brought to this court; and the omission of the circuit clerks to include them in the transcripts after the publication of this opinion, will be treated as contempt.

34 649
58 239
58 368

2. CRIMINAL PRACTICE: *Insufficient verdict.*
Upon the return into court of a verdict of " guilty as charged in the indictment," which charges murder in the first degree, the court should order the jury to retire and return a verdict in proper form; but if instead, a new trial is granted, such verdict is no bar to a trial and conviction of the defendant for murder in the first degree.

---

Ford vs. The State.

---

3. INSTRUCTIONS:

There is no error in refusing an instruction which is sufficiently embraced in other instructions given by the court.

4. CRIMINAL EVIDENCE: *Confessions.*

The confessions of a defendant should be cautiously received, but when deliberately and voluntarily made, they are among the most effectual proofs in the law.

5. SAME: *Testimony of other crimes than the one alleged.*

When a man is charged with one crime it is not competent to prove that he has committed others; but a witness of a conspiracy may state the whole plan or purpose of the conspirators to rob several parties, though it does not appear that they executed their plan except as to the one for the murder of whom the defendant is indicted.

6. ARGUMENT OF COUNSEL: *When subject to review in supreme court.*

The subjects and range, as well as the length, of the arguments of counsel, must necessarily be left to the sound discretion of the presiding judge; and, unless grossly abused to the prejudice of a party, it is not the subject of review in the supreme court.

7. WITNESS: *Defendant in criminal case, incompetent.*

A defendant in a criminal case can not testify or make a statement to the jury contradictory of the evidence.

APPEAL from *Crittenden* Circuit Court.

Hon. L. L. MACK, Circuit Judge.

*Henderson, Attorney General,* for the State.

ENGLISH, C. J.   When the transcript in this case was presented to one of the judges of this court for the allowance of an appeal, though there was attached to it the certificate of the clerk of the court below, that it was a full, true and complete transcript of the record, etc.; yet it contained no entry showing the impanneling of the grand jury, nor any entry by which it was made to appear that the indictment was returned into court by the grand jury.

In favor of human life, an appeal was allowed, and in furtherance of public justice, in accordance with the

practice of the court, a *certiorari* was awarded, upon which the clerk has returned a transcript of the entries which were wanting in the original transcript.

It seems difficult of late to get the clerks to understand that the entry showing the impanneling of the grand jury is a part of the record in every criminal case brought to this court on appeal or writ of error, and should be included in the transcript; and also the record entry showing that the indictment was returned into court by the grand jury.

To cure these omissions, the Attorney General or the court has had to order writs of *certiorari* in a number of cases, at the present and former terms; and the failure of clerks to discharge a duty, which they ought to understand and must learn, has retarded in this court the administration of public justice.

Supposing that the omissions were not willful on the part of delinquent clerks, we have not heretofore thought proper to order rules for contempt against them, but will feel compelled to do so, if such omissions occur after the publication of this opinion.

It now appears that on the sixteenth of December, 1879, Cal. Hughey, John Potter, L. L. Ford and Hiram Jeffrey, were indicted in the circuit court of Crittenden county, for murdering John Broadway, by shooting him with a pistol, on the twenty-sixth of November of that year; the indictment charging the offense in the usual form, as murder in the first degree.

Potter and Ford were arraigned, tried on the plea of not guilty, and the following verdict was returned: " We, the jury, find the defendants, John Potter and L. L. Ford, guilty, as charged in the indictment." Signed by the foreman.

They moved for a new trial on a number of grounds, and among them that the verdict was contrary to law.

The court sustained the motion, and granted a new trial

on the ground that the verdict did not fix the degree of murder of which the defendants were found guilty.

A *nol. pros.* was entered as to Potter, and he was discharged. Ford was again put on trial, and the jury found him guilty of murder in the first degree, as charged in the indictment. He moved for a new trial, which the court refused, and he took a bill of exceptions; was sentenced to be executed on the twenty-seventh of February, 1880, and prayed an appeal, which, as above shown, was allowed by one of the judges of this court.

I. The first verdict was no bar to a trial and conviction of appellant for murder in the first degree. *Allen v. State*, *26 Ark., 333.*

When the first verdict was announced, however, being insufficient, the court, before discharging the jury, should have ordered them to retire, and return a verdict in proper form. *Gantt's Dig., sec. 1957; Thompson v. State, 27 Ark., 328; Levells v. State, 32 Ark., 585.*

But that was not done, and, hence, the verdict was set aside and a new trial ordered.

II. It appears from the evidence set out in the bill of exceptions, that John Broadway lived near the Mississippi river, in Crittenden county. About dark of the evening of the twenty-sixth of October, 1879, four men armed with pistols and guns, and masked, went to his house for the purpose, it seems, of robbing him of money. His wife and step son, William Daniels, were in the house with him. The leader, or "*captain*," of the masked men, as the others called him, jumped on to the porch, and exclaimed, with an oath, "Throw up your hands! We want money!" or some such words. Broadway sprang up and took hold of a chair, and the leader shot and killed him. Two or three of the men then went through the house, but what money

they obtained does not appear. The four men then took William Daniels to the woods, robbed him of some money he had, tied him to a sapling with a fishing line, and left him there.

John Potter, who was made a witness for the state, identified the four masked men to be Hiram Jeffrey, the leader, Cal. Hughey (or Hewey, as. it is spelled in the bill of exceptions), appellant, Ford, and himself.

Some expressions of Ford, and circumstances, were in evidence conducing to prove that he was one of the four men.

There was no want of evidence to convict appellant, and our sense of justice is by no means shocked by the verdict.

III. It was proven that on the next morning after Broadway was murdered, seven men crossed the river in search of appellant, and found him in a cotton pen in Tennessee. Several of them testified that he said "it was a damned cold morning to call a fellow up out of his bed." One of them replied: "Yes, and a damned cold murder was committed on the other side of the river last night." To which appellant responded: "Did that damned fellow puke on me?" The word "puke" was perhaps intended for *peach.*

One of the arresting party testified that when appellant remarked "it was a damned cold morning," etc., he asked: "How many have you all got?" And witness replied: "Three, with Mr. Potter."

The same witness testified that when Potter was being examined before the committing magistrate, appellant said to him: "Do you know that I could present the bullets you wanted to kill John Broadway with?" Potter replied that he did not think he could do it.

Appellant's counsel moved to exclude the above expres-

sions made by him, as incompetent and irrelevant, and the court overruled the motion.

The witnesses proved that the expressions objected to, were voluntarily made by appellant. The court treated them as in the nature of confessions, and they were competent to go to the jury for what they were worth. *Meyer v. State, 19 Ark., 156; 14 ib., 556.*

IV. A witness also testified that, at the magistrate's trial, Hewey said to appellant and Jeffrey : "Boys, I am out of this, and, if Potter don't turn state's evidence, we are all right." To which, it does not appear that appellant made any reply.

Counsel for appellant moved to exclude this statement of the witness as incompetent and irrelevant, and the court overruled the motion.

The silence of appellant when Hewey, who was implicated with him in the crime, made the above remarks to him and Jeffrey, who was also implicated, was worth but little as a tacit admission, and such admissions should be received with great caution. We can not say, however, that the court erred in admitting it as competent for what it was worth. If appellant had felt that he was innocent of any participation in the crime, it would. perhaps, have been natural for him to have made some response to the remarks of Hewey indicating it. See, as to character and weight of such admissions, *1 Greenleaf Evidence, sec. 199; Burrill on Circumstantial Evidence, 48.*

V. Among others, appellant moved the following instruction :

"3. The jury will place little reliance on the testimony of John Potter, the accomplice, and should not convict the defendant on his evidence, unless the same be strongly corroborated by other evidence material in this case."

This instruction the court refused, but, before it was asked, the court had given nine instructions, which were not objected to by appellant, and which very fairly submitted the case to the jury upon all of the evidence, and among them the following, relating to the credit to be given to the testimony of an accomplice:

" 4. An accomplice is a competent witness against his co-defendants after he has been *nol. prossed* and discharged. But the jury should weigh his evidence with great caution, and should not find the defendant guilty upon his evidence unless he be corroborated, as to all material matters, by other unimpeached witnesses, or facts and circumstances proven in the cause.

" 5. But if, upon comparing his evidence with the whole evidence in the cause, they find his testimony corroborated by other witnesses, and facts in proof as to all matters material to the charge, so the jury can say, upon their oath as men, we verily believe the statements to be true, and every matter material to the issue, and their consciences approve such conclusions, they should believe and act upon his statements, relying on them as true.

" 6. Unless the jury find, from the evidence, that John Potter is corroborated in every material point, and that every material allegation in the indictment has been proved by him, with such corroboration, or some other witnesses, they should find the defendant not guilty."

These instructions, unobjected to, sufficiently covered the matter embraced in the fourth instruction moved for appellant, and refused by the court. It is needless to multiply and repeat instructions announcing, substantially, the same proposition of law.

VI. The court refused the following instruction, moved by appellant:

" 3. The confessions of defendant should be received with great caution, and carefully weighed, and if the evidence against the defendant consists of his confessions, unsupported by other evidence, the jury will find the defendant not guilty."

True, the confessions of defendant should be cautiously received, but when deliberately and voluntarily made, they are among the most effectual proofs in the law.   *1 Greenleaf Ev.*, secs. *214, 215.*

In this case, the confessions of the defendant were but a small part of the evidence, and were not unsupported by other evidence.

When Broadway was murdered, his wife and step-son, William Daniels, were present, and proved, on the trial as witnesses, all of the material allegations of the indictment, except that they were unable to identify appellant as one of the masked men who perpetrated the horrid crime.  He was identified by the direct testimony of Potter, which appears consistent, and was corroborated by circumstances and other evidence.

As framed, and upon the evidence and after the court had fully and fairly charged the jury upon the whole case, the third instruction asked for appellant, was properly refused—at least, we do not see that he could have been prejudiced by its refusal.

VII.  The court also refused the following instruction, which, it seems, was moved for appellant during the argument, and in consequence of remarks made to the jury by the prosecuting attorney:

" 5. The jury will disregard and exclude from their consideration any statement made by John Potter, a co-conspirator in the alleged crime, which tends to criminate the defendant, L. L. Ford, in other crimes contemplated by the

conspirators; such statements are not evidence in this case."

The portion of Potter's testimony, probably, referred to in this instruction, is as follows:

"The plan was formed at Hewey's boat, just before dinner. Ford was not present on the boat. Jeffrey, Hewey and another man said they were going over to plunder Broadway, Clarke, and James' store, and wanted Ford and myself to go with them. They offered Ford a lot of clothing and twenty five dollars in money. The offer was made that evening on the island to Ford. We went across that evening in a skiff, and went on down to a bluff bank about one hundred yards from the house. They then put some concerns on their faces. I had one made out of cloth over my face. Nothing was said. Ford had on a mask at Broadway's house, and had, also, a gun."

In a previous portion of his testimony he had stated what was ·done at the house, and how Broadway·was killed.

When a man is charged with one crime, it is not competent to prove that he has committed others. Ford and his co-conspirators were charged with murdering Broadway. It was proved that he was killed in an attempt by the conspirators, to commit robbery, which made the killing murder in the first degree. And all present, aiding and abetting, were principals. *Gantt's Dig.*, secs. *1253, 1238.* It was competent for the witness, Potter, to state the whole plan, or purpose, of the conspirators—to plunder Broadway, Clarke and James' store—though it does not appear that they executed their plan or purpose, except as to Broadway.

VIII. The bill of exception states that "the attorney for the state, in his opening argument to the jury, dwelt with

42

great stress and vehemence on the evidence elicited from witness Potter, that on the night of the killing of John Broadway the conspirators contemplated robbing Clarke and James' store; that Clarke and James were the moneyed men of the county; and, if such crimes were unpunished, any of us would be liable, at any time, to be robbed and murdered by that gang."

" To which line of argument, in dwelling on crimes contemplated by the conspirators, other than the one under investigation, defendant's counsel objected, and moved the court to restrain the attorney for the state;" but the court permitted him to proceed, etc.

Counsel, on both sides, in their zeal for their clients, or causes, sometimes overstep the bounds of prudence and fairness in their arguments to juries.

The remarks objected to were made in the opening address of the attorney for the state, and the able counsel for the prisoner (Adams, Frierson and Whitsitt) had the opportunity to reply. It may be that, if we had before us the full argument on both sides, instead of a fragment of the opening speech of the prosecuting attorney, it might be seen that counsel for the defense wandered in as wide lines as the attorney for the state.

Be this as it may, the subjects and range, as well as the length, of the argument of counsel, must necessarily be left to the sound discretion of the presiding judge. And, unless grossly abused to the prejudice of a party, is not the subject of review here. *Dobbins et al. vs. Oswalt, ex., 20 Ark., 619.*

IX. It appears from the bill of exceptions that after the evidence was closed, and before the argument commenced, " the counsel for defendant asked the court to allow the defendant to make a statement to the jury." The court

stated that it would allow defendant to make an argument before the jury, on the evidence, but would not allow him to make any statements contradicting the evidence that had been introduced. To which ruling, defendant excepted.

In criminal trials, the accused has a right "to be heard by himself and counsel." *Sec. 10, Declaration of Rights.*

By the common law, the accused can not be a witness for himself on the trial, and we have no statute changing the rule.

The court offered appellant the privilege of making an argument before the jury on the evidence. This was his constitutional right. But the court announced that it would not permit him to make any statement contradicting the evidence. There was no error in this. The court may well deny counsel the right to make statements contradicting the evidence, though they may discuss the probable truth, consistency, or falsity of evidence.

Upon a careful examination of the whole record, we find no error of law to the prejudice of appellant, for which the judgment should be reversed, and it must be affirmed.