530

## ADAMS v. THE STATE.

No. 6693. MAY 17, 1929.

W. Inman Curry, Thomas L. Hill, and J. B. & T. R. Burnside, for plaintiff in error.

George M. Napier, attorney-general, George Hains, solicitor-general, T. R. Gress, assistant attorney-general, John M. Graham, and Hammond & Kennedy, contra.

HILL, J. Burley Adams was indicted for the offense of murder by shooting Walter R. Tolbert in the body with a rifle. On the trial of the case the jury returned a verdict of guilty, without recommendation, and the defendant was sentenced to be elec-

trocuted. He made a motion for new trial on the general grounds and eighteen special grounds, which was overruled, and he excepted.

The evidence for the State tended to show that Walter R. Tolbert, a Federal prohibition officer, was shot and killed in Columbia County on February 22, 1928. On the day of the homicide Tolbert in company with several officers of Columbia County had raided a still in McDuffie County. Burley Adams with two other men, Schley Walden and Jones Moore, were present at the still when it was discovered by the officers, and all three fled upon their approach. The still was destroyed and the parts thereof were loaded into an automobile. The officers were engaged at this for about an hour and a half. They then started towards Harlem in Columbia County. In the car were Walter R. Tolbert, Wiley Harrison Jr., D. Fuller, and a Mr. Harrison, an uncle of Wiley Harrison Jr. All of these men had assisted in the raid on the still and in its destruction. In the car on the trip toward Harlem, Harrison Jr. and Tolbert were on the front seat, Tolbert being on the right side and Harrison Jr. on the left side, driving the car. The elder Harrison and Fuller occupied the rear seat. After proceeding along the road from the still-site to a point in Columbia County one or two hundred yards north of a creek known as Boggy Gut Creek, the occupants of the car heard a shot, and stopped the car, thinking that they were being shot at. They commenced to get out of the car, and officers Wiley Harrison Jr. and Fuller returned the fire in the direction from which they thought the other shot was fired. As Tolbert was getting out of the car, with one foot on the ground and the other on the running-board, holding a pistol in his right hand, he was struck by a bullet which entered his body on the left side about two inches below his collar-bone, penetrated his body from left to right, and came out just under the right shoulder blade. Where the bullet came out the flesh was torn, indicating that the bullet which penetrated Tolbert's body was a soft or dumdum bullet. After being shot Tolbert walked a few steps to the rear of the car and fell and died in a very short time. Fuller at the same time received a flesh wound in the right arm near the elbow. Fuller testified that the same bullet that penetrated Tolbert's body wounded him. The officers were unable to tell from which direction came the shots that were fired towards them. After the shooting ceased, Tolbert's body

was placed in the automobile and carried to Harlem. No one saw who did the shooting. Adams, the men who were seen with him at the still, and several others were arrested and placed in Richmond County jail at Augusta, where they remained for several days, and until Adams made an alleged confession, first to Charles Redding, the United States District Attorney, in the presence of Gary Whittle, the Richmond County jailer. This confession was subsequently taken down in shorthand by the court reporter of the Augusta Circuit, and then written out on a typewriter, as it appears attached to the brief of the evidence in this case.

On the trial Adams contended, in his statement to the jury, that Redding told him: "I have got forty men here. If you will come clean and tell us where this rifle is, we won't try this in the Federal court. We will put it down to the State court." He said, "These forty men, I am going to take them and going to find that rifle if I have to search every inch of your premises in that country," etc. He said, "Now I know, with respect to your wife and mother, you don't want this done. I wouldn't, and if you will tell us where the rifle is, me myself and Mr. Whittle will go and get the rifle, and none but us two." "So," stated the accused, "I told him where the rifle was, and made the statement that I did." After Adams made the statement to Redding, all the other persons who had been put in jail in connection with the homicide of Tolbert were released, Adams alone being held and put upon trial. At the time Tolbert was killed the officers did not know who killed him. No one had been seen shooting at the time it occurred. Adams subsequently made a statement or confession. He admitted having shot at the man, but let his statement or confession made to the United States District Attorney and to Whittle, the jailer, speak for itself. Redding, the U. S. District Attorney, on direct examination testified at the trial, as follows:

"In the investigation of this case I finally went to see Burley Adams in his cell at the jail. Mr. Whittle was with me. That was after we had worked on the case, after we had undertaken to go through every theory that had been advanced, and after we had gone to the scene of the shooting and had virtually reached our own conclusion about it. After that was done I went to the cell with Gary Whittle. I did not go at any time prior to that to have a talk with Burley Adams. I have had only one conversation

with Burley Adams, and that was the time. At the time I talked to Burley Adams I did not offer him in any respect any hope of reward for any statement he would make. I did not put him under any fear of punishment or coercion of any character whatsoever. I did not do it by suggestion. His statement was made to me and Gary Whittle absolutely voluntarily. Mr. Whittle and I went to his cell, and at first he sought to cast suspicion on a person to whom he first referred as 'Old man J. J.' and then later he told us that the man's name was Jules Zachry, and stated that if we would let him go and take an automobile he would show us just exactly how this thing was done by Zachry; and Mr. Whittle then, as I recall the way the conversation occurred, began asking him about this Winchester rifle—as to whether or not he owned one and what he had done with it. He denied that he had owned a Winchester rifle. Mr. Whittle kept asking him questions as to what had become of it. He continued to evade the question and to deny it. I then took up the line of questioning and said to him, 'Now, Burley, what we want to know is who was in this thing with you. We have a number of people in jail and we do not want to keep people in jail unnecessarily. Now, as far as you are concerned, we know that you were at the still. We know that you went home and got your gun, and we know that the shot was fired from the hill at the automobile as it came up the incline. We have traced the bullet, and we found one empty shell, a 30-30. We have also found a few shells that were used by you at target practice in the town of Harlem last week, and so we know that you had a 30-30 Winchester.' I said, 'Now, as far as you are concerned, it doesn't make any difference to us what you say about yourself. We are satisfied with the evidence we have against you, but what we want to know is who else was involved in this thing with you.' He said, 'Why, I was by myself all that day.' I said, 'Well, Burley, we know that you were not at the still by yourself, because we know who was there with you,' and I named the persons. 'We know that you went to the house by yourself. We know that you left the house by yourself, but we want to know if you met any one and if any one assisted you in this work that you did.' He continued to evade the question as best he could, and finally he said, 'Well, I might as well tell you the truth. There was nobody with me.' I said, 'There was nobody with you

when? When you did the shooting?' He said, 'Yes.' Then I said, 'You shot young Tolbert yourself?' He said, 'Yes,' I said 'Then there was no one else concerned in the shooting with you?' He said, 'No.' That, as I recall it, is the substance of his statement.

"He stated to us how that car stopped. I detailed to him that we had gone up on this hill and through the broken twigs that we had traced the course of the bullets, and that we knew that there were three bullets fired; that one went through a small oak tree and that there were evidences of two other bullets. He said, well, he had fired only three bullets. One he shot at the top of the car to stop the car and cause the people in the car to get out, and that then when they began getting out he fired two more shots and left. In the conversation I also told him that we had his wet shoes and we had his wet clothes; that his shoes had been taken to the place and had been placed in the track which he had made, and that the shoe fitted the track, and that there was a certain kind of grass that was on the shoe that was in that particular neighborhood from which the shots were fired; and in that connection, as I have stated a moment ago, I told him that I did not think we needed anything further to connect him with it, and what we wanted to do was to find out who else was in it, if anybody else was in it. After he made that statement, then either [I] or Mr. Whittle, probably both of us, began asking him to tell us where the rifle was. At first he said he would have his wife to deliver the rifle to us, and after some considerable evasion he told us that the rifle was in the hollow of a pine that had been boxed, and that if we would go around back of his house, back of the spring, there would be an old log lying down, and there were two pine trees there near this log, in one of which would be found the gun. We went there and found this gun. This is a mark that we made on it, trying to drive it out of the hollow with a wedge. It was stuck up in there so far you could only just catch the butt of it the least bit with the ends of your fingers, and then we had to chip a part of the tree away in order to get this wedge in and then we struck the butt of the gun with the wedge until we gradually worked it out. We found two boxes of cartridges there—steel-jacket and soft-nose bullets. During the time that this was going on I did not at any time tell Burley Adams that if he would come clean with this, or

words to that effect, that I wouldn't have anything to do with it in the Federal court and would pass it over to the State court. I did not at any time threaten him with an army of prohibition officers. I did not threaten him with forty of them. I did not put him under any threat at all. As a matter of fact, he was in a rather good humor, and the only regrets that he expressed at all were that he had gotten the wrong man. He stated quite positively that he was after Mr. Harrison and that young Tolbert had at no time done anything to him, and that he would not for the world have killed young Tolbert, but, he said, 'as far as Mr. Harrison is concerned, as long as I have this to him,' and he patted his chest, 'there is no danger from Mr. Harrison, but when this is turned to him,' indicating his back, 'then I figured it was just a question of which one would get the other first—Harrison get me or I get Harrison.' I went with Mr. Hains and the rest of them the day we sighted this rifle down on that car. In standing up at that firing point where Burley Adams admits that he has been, and where the shell was, and sighting down at that car, all the way down the line of fire there were bushes and trees and things of that sort. At the place where the firing point was, there was a dogwood tree that had rotted at the top of the ground, and it had fallen over on another tree at just about the angle that my arm is. Right there was a knot on the tree, that furnished a perfect resting place for the gun. Then about as far from where that tree was and where the shell was found, to where you are standing, we saw his first track, may be a little bit further than that—approximately that, though, and then the next track was a considerable distance from that—about that far [indicating], as though a man was running and was running rapidly at the time the second track was made. He stated that, leaving where he fired, he went in the direction from the road, which was the direction where we found the steps."

Whittle testified substantially to the same effect. The confession was corroborated in practically every detail by various witnesses for the State.

The first special ground of the motion for new trial alleges error on the ruling of the court in admitting, over the objection of movant, certain testimony of D. Fuller, a witness for the State, who testified that "Walter Tolbert said, 'Stop the car and let's see

what the trouble is.'" The contention that the testimony was hearsay, and that the witness should not have been permitted to testify to what Tolbert said, is without merit. The testimony was admissible as a part of the res gestæ.

■ Counsel for movant argues together grounds 1, 2, 3, 4, 5, and 6, as to the admissibility of certain testimony. We have considered ground 1 separately from the other grounds, because it stands upon a different footing. Grounds 2 to 6, inclusive, complain of the admission of certain testimony over the objection that it was "irrelevant and immaterial." The testimony set out in these grounds is as follows: (2) "I have seen one on him. He wore it in a belt. He said it was a 45 pistol. I don't know one pistol from another. I don't think I ever saw him without it." (3) "Mr. Moore and myself moved six sacks of sugar off the ground and put it in a buggy. We moved a sack of malt and moved it upstairs. I suppose it was barley malt. I don't know one malt from the other. We put it up stairs in the loft." (4) "I saw you picking up some cans out of the yard, but I didn't notice the holes. I saw some cans like that around in the yard, and saw you pick up some of them." (5) "I saw numbers of cans, shot through with bullet holes, in his yard, and that particular can was picked up in his yard." (6) A tin can with several holes shot through it was admitted in evidence over the above objection. Apparently the brief extract from the evidence set out in each of these grounds is irrelevant and immaterial. There is no statement in these grounds showing in what connection this evidence stood. The admission of evidence which is entirely irrelevant and immaterial is not usually ground for the grant of a new trial. Some statement should have been made in each ground showing that the evidence was injurious to the accused. A ground of a motion for a new trial should be complete in itself, and should show harmful error. To illustrate by one of these grounds: In ground 2 the evidence objected to as irrelevant and immaterial was that of a witness for the State, who testified: "I have seen one on him. He wore it in a belt. He said it was a 45 pistol. I don't know one pistol from another. I don't think I ever saw him without it." Whether the witness referred to the defendant on trial, or to the deceased, or to some third person, does not appear. We might assume that he referred either to the deceased

or to the defendant. Movant might have shown by the addition of three or four words to whom the witness was referring when he said, "I have seen one on him," or, "He wore it in a belt," etc. Without some statement in the ground of the motion showing how this evidence might affect the accused injuriously, a new trial should not be granted because of the admission of this evidence. And similar defects in grounds 3 to 6 are obvious.

■ Ground 7 for new trial complains of the following charge of the court: "Or, gentlemen of the jury, do you believe beyond a reasonable doubt that this defendant shot into an automobile in which there were three or four passengers, the deceased being one of them—shot in there because the officers had destroyed his still or distillery? If you believe that, and he did so without justification or mitigation, he is guilty of murder and you should so find him by your verdict, and he would be guilty if he shot under those circumstances, whether he intended to kill this particular man or not, or some other man, or, when he shot into that automobile of officers, if you believe that the evidence shows that, and he shot into them because they had destroyed his distillery;—if you believe that beyond a reasonable doubt, gentlemen of the jury, he is guilty of murder and you should so find him by your verdict, and that would be true whether he intended to kill any particular person in that car or not." This excerpt from the charge, when construed in connection with its context, was not erroneous under the facts of this case, for any of the following alleged reasons: "(a) That such charge was not based on evidence in the case, or any reasonable deduction from the evidence, in that there was no evidence that any shots were fired into a car containing three or four passengers or shot into "that automobile of officers," but on the contrary the evidence showed that Tolbert was shot after he had gotten out of the automobile and had either both feet on the ground or one foot on the running-board and one foot on the ground. (b) Because the court, in the above charge, instructed the jury to convict the defendant, if they found he shot into the automobile under the circumstances enumerated, regardless of whether Tolbert was killed by the defendant shooting into the car. (c) Because the above charge eliminated from the consideration of the jury the principal defense of the defendant, to wit, that while he admitted that he shot at Tolbert he disclaimed having

killed him, but on the contrary claimed that the bullet that killed Tolbert was fired by some other person and from some other gun than the one that he fired."

The entire charge on this subject is as follows: "So that, gentlemen of the jury, if you believe from the evidence in this case beyond a reasonable doubt that this defendant killed the deceased, you must find with what spirit, with what urge, with what motive—what caused him to kill him. Did he kill him at all? If he didn't, he would not be guilty of anything. If he killed him, did he shoot under the fears of a reasonable man that some bodily harm was about to be done him, amounting to a felony, and really acted under the influence of those fears and not in a spirit of revenge, he would be justified, and a seeming necessity when acted on in good faith is the equivalent of a real necessity. Or, gentlemen of the jury, do you believe beyond a reasonable doubt that this defendant shot into an automobile in which there were three or four passengers, the deceased being one of them—shot in there because the officers had destroyed his still or distillery? If you believe that, and he did so without justification or mitigation, he is guilty of murder and you should so find him by your verdict; and he would be guilty if he shot under those circumstances, whether he intended to kill this particular man or not, or some other man; or, when he shot into that automobile of officers, if you believe that the evidence shows that, and he shot into them because they had destroyed his distillery—if you believe that beyond a reasonable doubt, gentlemen of the jury, he is guilty of murder and you should so find him by your verdict, and that would be true whether he intended to kill any particular person in that car or not. I charge you, gentlemen of the jury, if you believe beyond a reasonable doubt that this defendant, without justification or mitigation, shot into a car of officers—some three or four—or passengers, not intending to kill any particular one in that car, and that the deceased, Mr. Tolbert, was one of the passengers, or one of the officers, in that car, and he did kill him, then he is guilty of murder and you should so find him in your verdict. I charge you that to constitute murder it is not necessary that the prisoner should entertain personal ill will toward the deceased. That is not necessary. If you believe beyond a reasonable doubt that he shot and killed him without justification or mitigation, he is guilty of murder."

■ Ground 8 of the motion for new trial assigns error on the following charge of the court: "If you believe that a confession was made and that confession was not made freely and voluntarily, you would not be authorized to convict on a confession alone, unless that confession was corroborated by other evidence or by evidence in the case." We are of the opinion that the charge complained of is erroneous and requires the grant of a new trial. It is not the law, as charged, that "if you believe that a confession was made and that confession was not made freely and voluntarily, you would not be authorized to convict on a confession alone, unless that confession was corroborated by other evidence or by evidence in the case." It may be that the judge in charging the jury that "If you believe that a confession was made and that confession was not made freely and voluntarily," etc., inadvertently used the word "not" before the word "made" where used the last time,— that it was a mere lapsus linguæ; but we can not assume that the jurors knew this. We must assume that the jury would accept the instruction as given in the spoken words. And if they did, then they would understand the judge to mean that a confession "not freely and voluntarily made," if it was corroborated by other evidence in the case, would authorize a conviction. That is not the law. A confession alone, though freely and voluntarily made, uncorroborated by any other evidence, will not authorize a conviction. This is explicity declared in section 1031 of the Penal Code, the language there being, "A confession alone, uncorroborated by other evidence, will not justify a conviction." But a confession not made freely and voluntarily, though it may be corroborated by other evidence, will not authorize a conviction, unless the corroborating evidence is, in itself and independently of the confession, sufficient to authorize a verdict of guilty. *Allen* v. *State,* 4 *Ga. App.* 458 (61 S. E. 840).

■ Ground 9 of the motion for new trial complains that the court erred in refusing a request to give the following in charge: "A confession induced by hope of favor or fear of injury, though corroborated, is insufficient to convict." The requested charge is not a proper one to be given. The court did charge: "Before you would be authorized to consider or before you can consider that confession, you must believe that it was made freely and voluntarily, without being induced by the slightest hope of benefit or

remotest fear of injury. Confessions of guilt should be received with great caution, and a confession alone, uncorroborated by other evidence, will not justify a conviction."

■ The 10th ground of the motion for new trial complains that the court erred in refusing a request to give the following in charge : "Environment under certain circumstances will render a confession inadmissible." It was not error to refuse the request. The confession was allowed to go to the jury without objection. The refusal to give the requested instruction was not error for the reason assigned, that it is pertinent and applicable to the facts of the case.

■ Ground 11 assigns error on the refusal of the following request to charge : "Gentlemen of the jury, if you believe that Adams shot at Tolbert at the time in question, with intent to kill him, and without sufficient provocation, but that he did not in fact kill Tolbert, he would be guilty of assault with intent to murder." This request was not pertinent and applicable to the case, and the court did not err in refusing it. The court did charge the jury : "Did he [the defendant] kill him at all? If he did not, he would not be guilty of anything." The charge actually given was more favorable to the defendant than the request, and the refusal to charge as requested is not error for any reason assigned.

■ Error is assigned in the 12th ground because the court erred in refusing to give the following requested charge : "If you, gentlemen of the jury, should disregard the confession introduced by the State, then the State's case would depend upon circumstantial evidence. The rule of circumstantial evidence is that the circumstances must not only be consistent with the theory of guilt, but must be so strong as to exclude every other theory save that of the guilt of the accused." The request was inapplicable to the facts of the case. The defendant in his confession said that he alone did the shooting, and he did not claim that the confession was made under the slightest hope of reward or fear of punishment. The nearest approach to it was in his statement when he said substantially that Mr. Redding, the district attorney, told him that if he did not tell them where the rifle was, they had forty men who would scour the country in order to find it. But this can not be construed as a threat, and a basis for the jury to reject the confession, in order that the rule with reference to convictions in cases of circumstantial evidence should be given to the jury.

■ Ground 13 assigns error on the refusal of the court to give the following requested charge: "I further charge you, gentlemen of the jury, that if you believe Mr. Harrison Sr., Columbia County revenue officer, threatened to kill Burley Adams next time he got him in the right place, and that such threat or threats were communicated to Burley Adams, and that Burley Adams, as a reasonable man, thought the deceased, Mr. Tolbert, was Mr. Harrison, and was shooting at the defendant, then the defendant had a right to shoot in self-defense and would not be guilty of murder or anything else, even though he was mistaken in the identity of the man and killed Mr. Tolbert, and a verdict of guilty would not be authorized." This request was not authorized by the evidence, but the court did give the defendant the benefit of that theory, and charged the jury: "If he did shoot he did so in his own self-defense, or under the fears—what we know in this State, under the doctrine of the fears of a reasonable man. So that, gentlemen of the jury, if you should not be able to find beyond a reasonable doubt, or believe beyond all reasonable doubt that this defendant killed the deceased, why, of course, you would acquit him. I charge you, gentlemen of the jury, if you believe that the defendant did kill the deceased and he did so under the fears of a reasonable man that some bodily harm was about to be done him amounting to a felony, and he really acted under the influence of those fears and not in a spirit of revenge, he would be justified and you would so find in your verdict, and a seeming necessity, when acted on in good faith, is equivalent to a real necessity." So we are of the opinion that the court gave the defendant a more favorable charge than he was entitled to in this respect, under the evidence in the case.

■ Voluntary manslaughter was not involved in the case, and the court did not err in failing to charge the law on that grade of homicide.

■ Ground 15 assigns error on the failure of the court to give in full the law with reference to the defendant's statement, having omitted to instruct them that the statement should have such force as the jury might think right to give it. On this subject the court charged the jury: "The prisoner has a right to make to the court and jury such statement as he deems proper in his own defense. It is not under oath, and you may believe it in prefer-

ence to the sworn testimony in the case." This charge was sufficient, in .the absence of a request for additional instructions. *Wilder* v. *State,* 148 *Ga.* 270 (2) (96 S. E. 325).

█ Ground 16 complains because the court failed to charge the jury as to the law of justifiable homicide, as contained in § 70 of the Penal Code. This was not error. The court charged fully on the defense, as set out in division 9 of this opinion.

█ In view of the fact that a new trial is granted in this case, the grounds of the motion based upon newly discovered evidence with reference to bias and incompetency of certain jurors are not passed upon, as this question is not likely to arise on the next trial of the case.

█ As the case goes back to the trial court for another hearing, we express no opinion as to the sufficiency of the evidence to authorize the verdict.

*Judgment reversed. All the Justices concur, except*

HINES, J., dissenting. I concur in all the rulings of the court except the one embraced in the fourth headnote and in the corresponding division of the opinion. From this ruling and the judgment granting a new trial I dissent. That ruling is based upon the assignment of error contained in the eighth ground of the defendant's motion for new trial. In this ground the defendant alleges that the court erred in charging the jury as follows: "If you believe that a confession was made and that confession was not made freely and voluntarily, you would not be authorized to convict on a confession alone, unless that confession was corroborated by other evidence or by evidence in the case." The assignment of error in this instruction is that the court in effect instructed the jury, that, even though the confession was not made freely and voluntarily, the jury would be authorized to convict the defendant on the confession, if the confession was corroborated by other evidence. The above extract from the charge is only a portion of the instruction given to the jury by the court upon the law of confession. On this subject the court charged as follows: "I charge, you gentlemen of the jury, if you believe that there was a confession made—you are to say from the evidence whether there was one made by the defendant or not,—before you would be authorized to consider, or before you can consider that confession, you must believe that it was made voluntarily, without being induced by the

slightest hope of benefit or remotest fear of injury. Confessions of guilt should be received with great caution, and a confession alone, uncorroborated by other evidence, will not justify a conviction." Immediately following the above instruction is the extract from the charge to which the defendant excepts; and his ground of exception, as stated above, is that the court in effect instructed the jury that they would be authorized to convict upon a confession which was not freely and voluntarily made, if such involuntary confession was corroborated by other evidence. It is manifest and clear that the use of the word "not" in the above extract from the charge is a palpable slip of the tongue, which clearly could not have misled the jury, when the above extract is read in connection with its context. Immediately preceding this extract the court expressly and emphatically instructed the jury that before they would be authorized to consider or before they could consider any confession, if they found a confession had been made by the defendant, they must believe that "it was made voluntarily without being induced by the slightest hope of benefit or remotest fear of injury." This gave the jury clearly to understand that they could not consider any confession made by the defendant unless it was made voluntarily. Intelligent jurors could not have been misled by the palpable slip of the tongue in the use of the word "not" in the above extract from the charge. It is clear that the court meant to tell the jury that even if a confession was freely and voluntarily made, they would not be authorized to convict on such confession alone, unless it was corroborated by other evidence.

Verbal inaccuracies in charges resulting from palpable slips of the tongue, which clearly could not have misled the jury, are not causes for new trials. In *Southern Bell Telephone Co.* v. *Jordan,* 87 *Ga.* 69 (13 S. E. 202), the court substituted "defendant" for "plaintiff" In *Hoxie* v. *State,* 114 *Ga.* 19 (39 S. E. 944), the court in his charge referred to the accused when he intended to refer to the deceased. In *Berry* v. *Clark,* 117 *Ga.* 964 (44 S. E. 824), the judge by a slip of the tongue designated the act of the scrivener as a mistake of law, when the mistake was one of fact. In *Southern Ry. Co.* v. *Merritt,* 120 *Ga.* 409 (47 S. E. 908), the judge used the word "defendant" when he should have used the word "plaintiff." In *Blackshear* v. *Dekle,* 120 *Ga.* 766 (48 S. E. 311), the court in an instruction used the word "plaintiff" when

544

he should have used the words "plaintiff's intestate." In *Seats* v. *State*, 122 *Ga.* 173 (50 S. E. 65), the court instructed the jury that the accused was under indictment for adultery and fornication, when in fact the indictment charged fornication only. In *Turner* v. *Elliott*, 127 *Ga.* 338 (56 S. E. 434), the court used the word "plaintiff" for "claimant." In *Perdue* v. *State*, 135 *Ga.* 277 (69 S. E. 184), the court instructed the jury that if they should find the defendant guilty of voluntary manslaughter, the form of their verdict would be, "We, the jury, find the defendant not guilty." In *Taylor* v. *State*, 138 *Ga.* 826 (76 S. E. 347), the judge in instructing the jury twice erroneously called the surname of the person alleged to have been killed, mentioning the name of a person who appeared on the indictment as a witness as the one killed. In *Lothridge* v. *Varnedoe*, 140 *Ga.* 131 (78 S. E. 721), the court used the word "plaintiff" when he should have used the word "defendant." In *James* v. *Hamil*, 140 *Ga.* 168 (78 S. E. 721), the court referred to a party as "Willie Hamil" when he should have referred to J. A. Hamil. In *L. & N. R. Co.* v. *Culpepper*, 142 *Ga.* 275 (82 S. E. 659), the court referred to the plaintiff as a brakeman, when he was in fact a flagman. In *Rhodes* v. *State*, 144 *Ga.* 837 (88 S. E. 196), the court instructed the jury that the presumption of innocence prevents conviction of a defendant unless removed by evidence which excludes every reasonable doubt in the minds of the jury "as to his innocence." In *Duke* v. *Hogan*, 155 *Ga.* 360 (116 S. E. 598), the court used the word "plaintiff" where he should have used the word "defendant." This court, in these and other cases which could be cited, held that these slips of the tongue did not require the grant of a new trial.

The slip of the tongue in this case was no more serious than the slips in some of the cases cited. In *Turner* v. *Elliott*, supra, which was a claim case, the court instructed the jury as follows: "In this case the claimant admits a prima facie case . . for the plaintiff and assumes the burden of proof, and the burden is upon the plaintiff to satisfy you by a preponderance of the evidence that the property is not subject to the execution or levy." The slip of the tongue in that case is just as serious, or more serious than the one with which we are dealing. In *Rhodes* v. *State*, supra, the court instructed the jury that the presumption of innocence prevents conviction of a defendant, unless removed by evidence

which excludes every reasonable doubt in the minds of the jury "as to his innocence." In that case the defendant was charged with murder, and the slip made in the charge of the court therein was much more serious than the slip made in the charge of which the defendant in this case complains. So as the inaccuracy in the extract from the charge, to which the defendant excepts, could not be misleading to the jury, a new trial should not be granted on account of such inaccuracy. Furthermore a new trial should not be granted on account of this slip of the judicial tongue, because there is no evidence in the case tending to show that the confessions made by the defendant were not freely and voluntarily made. In view of this fact any inaccuracy in the charge dealing with these confessions, upon the theory that they were not made voluntarily, does not require the grant of a new trial.

But there is a much more impelling reason why a new trial should not be granted in this case. The uncontradicted evidence makes a case of assassination. The deceased, who was a prohibition enforcement officer, had destroyed a still from which the defendant had fled when the deceased and other officers approached it. In revenge for the destruction of this still the defendant waylaid the officers, and from ambush, with a long-range rifle, shot and killed the deceased. The guilt of the accused was established by his separate full confessions. Independently of these confessions the other evidence authorized the jury to find that the defendant had assassinated the officer out of revenge for the destruction of this still. In these circumstances should this court grant a new trial for the above inaccuracy in the charge of the court touching confessions? In *Johnson* v. *State,* 14 *Ga.* 55, 65, this court said: "Admitting, then, that this portion of the charge was justly obnoxious to the objection which I have stated, should we send this case back for another trial? After the most anxious consideration, our determination is to let the verdict stand. Had there been anything like an equipoise of testimony—much more, had the preponderance been in favor of the accused, we should not have hesitated a moment in awarding a new trial. A new trial ought never to be granted, notwithstanding some mistake or even misdirection by the judge, providing the revisioning court is perfectly satisfied that justice has been done; and that upon the evidence no other verdict could properly have been found." In *Parker* v. *State,*

34 *Ga.* 262, 267, this court dealt with a charge touching confessions, and used this language: "But when the court undertakes to analyze or define what makes a confession voluntary, both members of the definition should be presented to the jury, to wit: *the slightest hope of benefit,* or the remotest fear of injury." While conceding that the instruction on confessions was erroneous, this court said: "So well satisfied are we of the guilt of the prisoner, and that the finding of the jury was not contrary to, but in accordance with, the testimony, that we are unwilling to send this case back upon any of the grounds taken in the motion for a new trial." In *Wise* v. *State,* 34 *Ga.* 348, which was a murder case, this court held: "Though the charge of the court was not felicitous—and in some respects inaccurate—on the subject of drunkenness, yet the jury not being misled, and the evidence being strong and decidedly in favor of the verdict, a new trial should not be granted." In *Tucker* v. *State,* 57 *Ga.* 503, this court held, speaking through Chief Justice Warner, that "it is error for the court to charge that the jury should return a verdict of guilty," but refused to grant a new trial, saying, "But, notwithstanding the court may have erred in its charge to the jury, still the verdict was right under the evidence and the law applicable thereto, and we will not disturb it." In *Johnson* v. *State,* 59 *Ga.* 142, Judge Bleckley, speaking for this court, approved the above ruling in 14 *Ga.,* and approved what was said in that case, the principle approved being: "A new trial ought never to be granted, notwithstanding some mistake, or even misdirection, by the judge, provided the reviewing court is perfectly satisfied that justice has been done, and that, upon the evidence, no other verdict could properly have been found." In *Hussey* v. *State,* 69 *Ga.* 54, 59, this court said: "Where, as in this case, the evidence demands the verdict, inaccuracies, or even errors of the court, unless of very material gravity, will not require a new trial." In *Hagar* v. *State,* 71 *Ga.* 164, 167, this court said: "The evidence is overwhelming that the defendant is guilty; and where such is the case, even errors in the admission or rejection of testimony, or in the charge of the court, will not operate so as to require a new trial."

These cases could be multiplied. So in view of these rulings the question is this: In a case where no verdict could properly be rendered except the one which was rendered, is it proper for

this court to grant a new trial merely upon the ground of a slip of the tongue or an inaccuracy in the charge of the court? In this case shall we send the case back for another trial in order to permit the judge to correct this slip by striking out the word "not" in the extract from his charge complained of in this case? In these circumstances I do not think that a new trial should be granted. The guilt of the accused being clear, resting upon his full confessions of his guilt, his confessions being fully corroborated by independent evidence which would authorize his conviction if there were no confession, the due enforcement of the criminal laws and the protection of society require the refusal of a new trial which is sought upon an inaccuracy in one extract from the charge of the court. For these reasons I feel constrained to dissent from the judgment of the majority granting a new trial to the defendant.