The evidence authorized the verdict; and none of the exceptions to the charge, which are dealt with in the opinion, authorize the setting aside of the verdict and sentence.
 No. 14976. OCTOBER 7, 1944.
Henry Thurmond was indicated for the murder of Jack Stevens, and, upon being found guilty with a recommendation of mercy, was sentenced to life imprisonment. He excepts to the overruling of his motion for a new trial as amended.
Ralph Gray testified for the State that, on the evening before the homicide, Henry Thurmond came to the filling station where the witness worked and asked what it was that Jack Stevens had to say about him, that he had heard something about what Jack said he was going to do to him; that the next day Thurmond came back with a gun, which one Whitley wanted to trade for, but didn't want to pay the price asked; that Thurmond had said that, if Jack said anything "like that" to him, he was going to kill him and said he didn't want to sell it at that, as "I am figuring on *Page 411 
having to use it tonight. . . He didn't say who he was going to use it on at that time, but he had just said before. From what he said, I understood it was Jack;" that he was a night watchman and could have meant he wanted to use it on his job; and that he didn't say he was going to use it on Jack Stevens, but he was blowing off about Stevens, and when Calloway came in, he didn't say anything about using the gun on Mr. Stevens. Mrs. Roy Williams testified for the State that her husband operated the H and H, a drive-in eating place and dance hall, and she was there on August 20, 1943, when Jack Stevens was shot; that she knew Henry Thurmond only by sight, and that night he came there with the wife of Jack Stevens and a short fellow; that they went to a booth in the back, in the dance hall; that she did not know Jack Stevens, but recalled having seen him come in before the trouble and go in the back; that she didn't notice where he went, and he didn't stay but just a little while, about five minutes, then they came back and went on the outside; that Stevens came out and Thurmond was right behind him, about four feet behind him, and Stevens went out of the door first, and when Thurmond went out of the door, she heard a shot — two shots just as quick as it could happen after he went out of the door; that when she heard the shots, she went to the front door where she could see through the window; that she looked out of the window before she got to the door and saw Thurmond; that when he fired the two shots he was about a step from the door down on the concrete; that there is a step from the door down to the concrete, and he was about a step away from that step by the door; that Stevens was about three steps in front of him; that when Thurmond shot, Stevens's body just twisted and went to the ground — he was just going to the ground and hit face up; that as she got to the door, Thurmond walked out to the front quick and walked to the other side of him and said, "Lady, call the sheriff, I'm not going to run, here's the gun;" that at the time Stevens came into the place, nor at the time he went out, nor at the time he was falling, did she see any knife in either of his hands; that it was light enough to see a knife lying by his hand; that when Stevens went back into the dance hall, she didn't hear or see or sense any unusual situation or friction — voices, argument, or misunderstanding; that nothing occurred within her sight or hearing as they left the dance hall and went out of the door to *Page 412 
make her suspect any trouble; that Stevens died before he was picked up. On cross-examination, she testified that she asked him "how come him to do it," and he said the man was cutting at him; that was right after the shooting took place; that after she went back into the place, she went back out there several times, and after Mr. Summerville came, she saw a knife lying open on the ground close to his hand about an inch from his fingers which she hadn't seen the first time, at which time she was excited; that it was about ten minutes after Thurmond and the girl and man with him came in that Stevens came in; that Thurmond was not drinking that she could tell, she could see no indication of it; that the booth they occupied was an open booth with nothing to hide them from anyone there; that there was a music box there, but she didn't know whether it was going at the time, but it usually was, and there was a large crowd there at the time, and people were in most of the booths near the one Thurmond occupied; that the dancers and those in other booths could see into the booth they occupied; that when Stevens and Thurmond went out, she didn't hear either of them say anything; that either or both of them might have had a knife or other weapon in their hands so far as she knew; and that Thurmond stayed there until the sheriff came, and gave nobody any trouble. Dwight Shaw testified for the State that on the night of the homicide he was at the H and H; that he knew Henry Thurmond, but did not know Jack Stevens; that he didn't see Thurmond before the killing, but saw him first when he was standing three or four feet from the fellow that was killed; that the witness had not seen anyone else in his party whom he recognized before that time; that when the shots were fired, he was standing at the end of the counter nearest the door, and when he went out, he didn't see any knife near either hand; that he asked Thurmond, "Who shot this fellow, Henry?" and he replied, "Well, I had to, I hated to do it, but had to do it;" that some boy was with him who said, "You ain't got anything to worry about, Henry, he was trying to cut you; you done it in self-protection;" that the witness told Thurmond, "Give me your gun, Henry," and he pulled it out of one of his back pockets, and gave it to the witness, who carried it into the building; that he never saw a knife anywhere about the dead man's hands, although it was light enough to have seen one if it had been there. On cross-examination, *Page 413 
he testified that he didn't see any cut on Thurmond's arm, but couldn't say whether there was one or not, and that he didn't make any particular examination of the ground, and didn't know whether the knife was there or not, but it could have been. Miss Dorothy Jean Williams, daughter of Mrs. Roy Williams, testified for the State that on the night Jack Stevens was killed she was in a car in front of her father's place of business; that when Stevens came out of the door, he just walked on; that he was three or four steps — just a little piece — ahead of the man that did the shooting when he got shot, and was just walking on when he got shot, and didn't do anything to the man who shot him; that she never saw a knife in his hand; that the deceased did not try to hit or cut Thurmond; and that when Thurmond did the shooting, he had stepped down off the step and had taken just about one step. Emmett Summerville testified for the State that he was a deputy sheriff of Haralson County, and investigated the death of Jack Stevens; that there was a little two-bladed knife about six or eight inches from the hand of the deceased, which was plain to see, with its blade open; that the body of the deceased was lying fifteen or sixteen feet from the front door of the H and H place; that the lighting was sufficient, and he had no difficulty in seeing the knife; that he sent the body to the undertakers, where he examined it; that he cut the belt off from the body; that there was a hole through the two thicknesses of the belt at the belt lap which compared with a hole in the lower portion of the abdomen of the deceased and was identical with that wound; that he found a knife in his pocket, which was closed; that he found two holes in the body, presumably bullet holes, such holes as a bullet would make; that, from his examination, one of them went in right below the shoulder blade and came out through the shirt pocket, and the next one went in right above the belt to the left side and came out through the double part of the belt there. On cross-examination, he testified that the marks in the back of the shirt represented where the bullets went in; that there were some brown or black-looking spots below one of the holes, which he did not think were powder burns but thought were lead coloring; that there was a mark below the hole; that there were marks on the front where the bullet came out, not black marks; that the lower one seemed to range down; that the upper one ranged down at an angle; that *Page 414 
the black mark was all the way around the lower one and on the lower part of the top one, but not on the upper part of the top one, and there was blood around each one; that he wouldn't say whether the shots were fired at close range, but if there were powder burns, it would indicate close range; that in his opinion there were no powder burns, which spread more; that the lower hole had a mark all around it, but not big enough for powder burns, and from his best knowledge he would say that it was not at close range; that powder burns make little speckled places; that when he arrived at the scene of the homicide, he wouldn't say that Thurmond was drunk, and Thurmond said he was not drunk. L. B. Sanders, testifying for the State, identified a knife as having belonged to the deceased, who worked for the witness; and on cross-examination stated that he did not know how many knives the deceased had. Dr. O. D. King testified for the State that, on the day of the homicide, he examined the body of the deceased at the funeral home and found two bullet wounds, both entering from the back and both ranging downward; that the front wounds were lower than those on the back; that the two wounds were in the left chest and abdomen, the "chest" referring to the back as well as the front; that in his opinion they were mortal wounds and caused his death; that the brownish-looking marks, not blood, about where the bullets entered the body, were not sufficient for him to determine whether or not they were powder burns. In a statement to the jury, the defendant denied his guilt, and said that he had worked all day, and was to go on as watchman again at ten o'clock that night; that he had his pistol in his car because he needed it in night-watching; that he had the pistol the night before at the filling station when John Worthy came by and said Jack Stevens wanted to see the defendant; that they "rode down to her house, and she was not at home," so they went back to the filling station, when Irby Whitley came in and inquired about his pistol, but didn't want to pay enough for it, so they didn't trade, then Jack's (Stevens's) wife came by in a car and holloed to him to come by her house; that he and John drove down there, and she wanted him to carry her and John to Bremen, which he promised to do; that they stopped and got a bottle of beer and drove to Bremen, and Jack's wife said she wanted to go to the H and H, which they did, and ordered some beer and sandwiches, and had just got them when Stevens came in *Page 415 
and came back to where they were sitting, John (Worthy) and his (Stevens's) wife and the defendant; that Stevens was very mad, had his knife out and started cursing him and ordered him to come outside; that he told Stevens he didn't want to go out and have any trouble with him and asked him to sit down and have a sandwich and something to drink; that John slid over to give Jack room to sit down, and Jack said to John, "You sit still and keep your lip out of it, this is the . . I am after, . . and reached around and put his knife around my neck, and says [cursing him], `I said for you to get up and come on outside;'" that he was afraid Stevens would cut him, as he knew he was bad about cutting people and once shot a policeman who was trying to arrest him for breaking into a house, and his case was still pending; that he knew Stevens was a dangerous man and he was going to cut him if he didn't do what Stevens said; that he walked out ahead of Stevens, and got about eight or ten feet from the door, and Stevens was right behind him coming on with his knife open in his hand, and the defendant backed up and got back on the step and was trying to get back inside while begging him to stop; that Stevens came on him so close he couldn't get the door open, so he got his gun out, and Stevens hit him on the arm with his knife, and the defendant shoved him off and shot twice, and when he was lying on the ground the knife was lying on the ground open; that Stevens and his wife were not living together when this happened; that he didn't take Stevens's wife from him, and didn't even take her off that night; that he was taking her and John Worthy because he had a car and they wanted to go; that he tried to keep from having any trouble; that Stevens's divorce was then pending in Alabama, and his wife had him under a peace bond; that Stevens intended to kill him and would have done so, and cut the defendant before he shot to save his own life.
1. After having charged that the burden is on the State to show to the satisfaction of the jury beyond a reasonable doubt that the defendant was guilty as charged, before they would be authorized to convict him, and that the presumption *Page 416 
of innocence remains with the defendant and prevails in the case in his favor until the State introduces evidence sufficient to satisfy the minds and consciences of the jurors beyond a reasonable doubt of his guilt, the court defined reasonable doubt as follows: "Those words have just their ordinary everyday meaning. Everybody understands what a reasonable doubt is. A reasonable doubt is an actual doubt that you are conscious of, after going over in your minds the entire case, giving consideration to all the evidence and every part of it, and the defendant's statement. If you then feel uncertain and not fully convinced that the defendant is guilty, and believe that you are acting in a reasonable manner, and if you believe that a reasonable man, in any matter of like importance, would hesitate to act because of such doubt as you are conscious of having, that is a reasonable doubt, of which defendant is entitled to have the benefit." This instruction is not subject to the criticisms, especially in the absence of any request to charge: (a) that the court should have gone further and stated that if the jury had a reasonable doubt of guilt the defendant should be acquitted; (b) that the court should have stated that a reasonable doubt is a doubt that grows out of the evidence or lack of evidence, a conflict in the evidence or the want of sufficient evidence to convict, and if they had such a doubt the defendant should be acquitted; (c) that such charge was not a correct statement or explanation of the law of reasonable doubt and was misleading and confusing to the jury. The charge would have been sufficient without any further explanation or definition of reasonable doubt (Nash v. State, 126 Ga. 549, 55 S.E. 405; Battle v.State, 103 Ga. 53 (2), 29 S.E. 491); and the court having instructed the jury in another portion of the charge that, if they had a reasonable doubt of the defendant's guilt on the charge of murder and on the charge of manslaughter, they should find the defendant not guilty, it was unnecessary to repeat, in connection with the definition of reasonable doubt, that, if the jury had a reasonable doubt of guilt, the defendant should be acquitted. While we do not think that the charge complained of in the instant case could have misled the jury, many of the attempts to elucidate the meaning of the words "reasonable doubt" present questions of difficulty, and we feel constrained to repeat the language of Mr. Justice Little in the Battle case, supra, in which he says: "There are no words *Page 417 
plainer than `reasonable doubt,' and none so exact to the idea meant. Hence some judges, it would seem, wisely decline attempting to interpret them to the jury."
2. The Code, § 38-415, provides: "In all criminal trials, the prisoner shall have the right to make to the court and jury such statement in the case as he may deem proper in his defense. It shall not be under oath, and shall have such force only as the jury may think right to give it. They may believe it in preference to the sworn testimony in the case. The prisoner shall not be compelled to answer any question on cross-examination, should he think proper to decline to answer." The court gave the following instruction relative to the defendant's statement: "In all criminal cases . . the defendant has the right to make such statement to the court and to the jury as he sees proper in his own defense. Under the law of this State, the defendant is not sworn. He is not subject to examination or cross-examination, yet you have the right to believe his unsworn statement in preference to the sworn testimony in the case." In Cargile v. State,137 Ga. 775 (2) (74 S.E. 621), this court said: "While it is true that a defendant in a criminal case electing to make a statement is not subject to cross-examination without his consent, yet as this provision of the statute is but a rule of trial procedure, it is the better practice to omit any reference to it in the general charge. Nevertheless, the statement of this rule of procedure in the general charge will not ordinarily be ground for a new trial." We cannot see how this charge, taken as a whole, could properly be taken as minimizing or discrediting the defendant's statement or as unduly emphasizing the fact that the defendant was not sworn, or as being an expression "of an opinion by the court that the defendant was not entitled to any credit by the jury and was unworthy of belief." It is never error, in the absence of a written request, to fail to give a charge in the language which the defendant contends would have been proper, when the correct principle of law was charged. Adams v.State, 168 Ga. 530 (7, 11) (148 S.E. 386); Wilder v.State, 148 Ga. 270 (2) (96 S.E. 325).
3. The following is part of the charge relative to malice: "Legal malice may not be ill-will or hatred. It is an unlawful intention to kill, without justification, excuse, or mitigation; which intention, however, must exist at the time of the killing as alleged. *Page 418 
But it is not necessary for that intention to exist for any length of time before the killing. In legal contemplation, a man may form the intention to unlawfully kill, do the killing instantly, and regret the deed as soon as it is done. In other words, murder is the intentional killing of a human being by the intentional use of a weapon that, in the manner it is used at the time, is a weapon likely to kill, and a killing without justification, excuse, or mitigation." Exception was taken to this excerpt on the ground that the court expressed and intimated an opinion that the defendant had malice, that he maliciously killed the deceased, and that malice existed in his mind at the time of the alleged killing; and that the court deprived the jury of the right to say, under the evidence and circumstances of the case, whether there was express or implied malice. Neither in the exception nor in the brief does the plaintiff in error point out what portion of this excerpt he contends expresses an opinion. The first sentence of the excerpt conforms to the statement approved in Taylor v. State, 105 Ga. 746 (31 S.E. 764). In that case the court held as follows: "The popular idea of malice in its sense of revenge, hatred, ill-will, has nothing to do with the subject (legal malice); it is an intent to kill a human being in a case when the law would neither justify nor in any degree excuse that intention, if a killing should take place as intended." The next two sentences of said excerpt are similar in effect to the charge approved in Dennis v. State, 146 Ga. 191
(91 S.E. 19), as follows: "A person may form the intention to kill, do it instantly, and regret it as soon as it is done," where the court had just defined express and implied malice and had instructed the jury that malice is an unlawful intention to kill without justification or mitigation. In Buckhanon v.State, 151 Ga. 827 (3) (108 S.E. 209), this court held that a charge defining express malice in the language of the Code is not an expression of an opinion. We find no error in the excerpt complained of.
4. The court gave the following instruction to the jury: "Any person charged with murder has a right to defend himself and show that he was justified, and this is known to the law as justifiable homicide. So justifiable homicide is the killing of a human being in self-defense, or against one who manifestly intends or endeavors, by violence or surprise, to commit a felony on him, that is, the defendant. The term `felony' as used in this connection *Page 419 
means an offense for which the offender, on conviction, would be subject either to the death penalty or to imprisonment in the penitentiary, and not otherwise. All other instances which stand upon the same footing of reason and justice as those enumerated shall be justifiable homicide. The bare fear of any of those offenses to prevent which the homicide is alleged to have been committed shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that the party killing really acted under the influence of those fears and not in a spirit of revenge." This excerpt is excepted to as being a misstatement of the law and as being confusing and misleading, as follows:
(a) "The portion of the charge, that any person charged with murder has a right to defend himself and show that he was justified, is misleading for the reason that he has a right to defend himself at the time of the alleged attack when the deceased was killed, and not at the trial of the case." If there could have been any misunderstanding as to the intention of this portion of the charge it was cured by the definition of justifiable homicide immediately thereafter, which made it clear that the killing of a human being in self-defense or against one who manifestly intends or endeavors, by violence orsurprise, to commit a felony on him, was justifiable homicide. The jury could not have understood the court to mean that "self-defense" related to his defense at the trial nor that at the trial he was defending himself physically from a violent or surprise attack from someone intending to commit a felony upon him.
(b) The movant further says that this excerpt from the charge was erroneous as confusing the law of self-defense or voluntary manslaughter with the law of reasonable fear; and that, havingpreviously charged in connection with voluntary manslaughter that provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder, the court should have gone further and instructed the jury that "they should not let that confuse their mind with the law of justification, acting under the fears of a reasonable, courageous man, that (if) his life was in danger or apparently so, he would be justified." There is no merit in these grounds of complaint. Here the charge was clearly limited to *Page 420 
justifiable homicide, in which the defendant was given the benefit of his right to defend against both actual peril and against what might, under the circumstances, appear to be so by one acting under the fear of a reasonable man. The law of voluntary manslaughter was stated in other and different portions of the charge.
5. The evidence not being limited to testimony circumstantial in its nature and character, the court did not err in referring in his charge both to direct and circumstantial evidence. Nor, since the jury was fully charged on their right to believe the defendant's statement in preference to the sworn testimony, was it reversible error not to include a reference to his statement in that portion of the charge here complained of.
6. There being testimony as to previous threats recently made by the defendant against the deceased, the court did not err in telling the jury that they might consider any such testimony, and if they should determine that any such threats were made, they might consider such a fact as illustrating the state of mind or feeling of the defendant against the deceased.
7. The court charged as follows: "On the question of express malice, and that is the reason why threats, if any were made, are admissible in evidence to illustrate, if they do, whether or not the defendant had malice in his mind at the time of the alleged killing. So, on the question of express malice, the court charges you that you may look to all the facts and circumstances and determine whether or not the defendant made threats against the life of the deceased, and whether or not he planned to carry those threats, if any, into execution in any manner when an opportunity presented itself, if one did, and then carried these threats, if any, into execution by killing the deceased in the manner as charged in the bill of indictment." We are unable to see that this excerpt was either "misleading" or "confusing," or that it "emphasized" the State's theory or "minimized" the defendant's contention, or that it amounted to an expression of opinion on the facts to which the charge related.
8. The court did not seek to coerce nor did it manifest any desire that the defendant be convicted in charging the jury this excerpt: "If you are not satisfied beyond a reasonable doubt, or if you have a reasonable doubt of the defendant's guilt on the charge of murder, and on the charge of voluntary manslaughter, the form *Page 421 
of your verdict would be, `We the jury find the defendant not guilty;' and that would mean, of course, that he is not guilty of any crime in connection with the alleged transaction."
Judgment affirmed. All the Justices concur.