FERGUSON *v.* GEORGIA.

No. 44.   Argued November 14–15, 1960.—Decided March 27, 1961.

*Paul James Maxwell* argued the cause and filed a brief for appellant.

*Dan Winn,* Solicitor General of Georgia, argued the cause for appellee.   With him on the brief were *Eugene Cook,* Attorney General, *John T. Ferguson,* Deputy Assistant Attorney General, *John T. Perrin,* Assistant Solicitor General, and *Robert J. Noland.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The State of Georgia is the only State—indeed, apparently the only jurisdiction in the common-law world—to retain the common-law rule that a person charged with a criminal offense is incompetent to testify under oath in his own behalf at his trial.   Georgia in 1866 abolished by statute the common-law rules of incompetency for most other persons.   However, the statute, now Georgia Code § 38–416, expressly retained the incompetency rule as to persons "charged in any criminal proceeding with the

commission of any indictable offense or any offense pun-
ishable on summary conviction . . . ." Two years later,
in 1868, Georgia allowed the criminal defendant to make
an unsworn statement. The statute enacted for that pur-
pose, as amended, is now Georgia Code § 38–415, and
provides: "In all criminal trials, the prisoner shall have
the right to make to the court and jury such statement
in the case as he may deem proper in his defense. It shall
not be under oath, and shall have such force only as the
jury may think right to give it. They may believe it in
preference to the sworn testimony in the case. The pris-
oner shall not be compelled to answer any questions on
cross-examination, should he think proper to decline to
answer."

In this case a jury in the Superior Court, Douglas
County, Georgia, convicted the appellant of murder, and
he is under sentence of death. After the State rested its
case at the trial, the appellant's counsel called him to the
stand, but the trial judge sustained the State's objection
to counsel's attempt to question him. To the argument
that to deny counsel the "right to ask the defendant any
questions on the stand . . . violates . . . [Amendment]
VI . . . [and] the Fourteenth Amendment to the Con-
stitution of the United States . . . [because] it deprives
the defendant of the benefit of his counsel asking him
questions at the most important period of the trial . . . ,"
the trial judge answered that under § 38–415, ". . . you
do not have the right to do anything more than instruct
your client as to his rights, and . . . you have no right
to question him on direct examination." In affirming the
conviction and sustaining this ruling, the Supreme Court
of Georgia said:

> "The constitutional provisions granting to persons
> charged with crime the benefit and assistance of
> counsel confer only the right to have counsel per-

form those duties and take such actions as are permitted by the law; and to require counsel to conform to the rules of practice and procedure, is not a denial of the benefit and assistance of counsel. It has been repeatedly held by this court that counsel for the accused cannot, as a matter of right, ask the accused questions or make suggestions to him when he is making his statement to the court and jury." 215 Ga. 117, 119, 109 S. E. 2d 44, 46–47.

On appeal brought here under 28 U. S. C. § 1257 (2), we noted probable jurisdiction. 362 U. S. 901.

The only question which the appellant properly brings before us is whether this application by the Georgia courts of § 38–415 denied the appellant "the guiding hand of counsel at every step in the proceedings against him," *Powell* v. *Alabama*, 287 U. S. 45, 69, within the requirements of due process in that regard as imposed upon the States by the Fourteenth Amendment. See also *Chandler* v. *Fretag*, 348 U. S. 3.

Appellant raises no question as to the constitutional validity of § 38–416, the incompetency statute.[1] However, decision of the question which is raised under § 38–415 necessarily involves consideration of both statutes. Historically these provisions have been inter-

---

[1] It is suggested in the concurring opinions that we should nevertheless adjudicate the validity of § 38–416. Apart from the incongruity of passing upon the statute the appellant expressly refrained from attacking, and disregarding his challenge to the statute he did call in question, such a course would be disrespectful of the State's procedures. For it appears that the Georgia Supreme Court would not have entertained an attack on § 38–416, since the appellant did not offer himself to be sworn as a witness. See *Holley* v. *Lawrence*, 194 Ga. 529, 22 S. E. 2d 154; appeal here was dismissed on the express ground that "the judgment of the court below rests upon a nonfederal ground adequate to support it, namely, that the failure to tender such testimony at the trial barred any later claim of the alleged constitutional right . . . ." 317 U. S. 518.

twined. For § 38–416 is a statutory declaration of the common-law rule disqualifying criminal defendants from testifying, and § 38–415, also with its roots in the common law, was an attempt to mitigate the rigors of that incompetency.

The disqualification of parties as witnesses characterized the common law for centuries. Wigmore traces its remote origins to the contest for judicial hegemony between the developing jury trial and the older modes of trial, notably compurgation and wager of law. See 2 Wigmore, Evidence, pp. 674–683. Under those old forms, the oath itself was a means of decision. See Thayer, Preliminary Treatise on Evidence, pp. 24–34. Jury trial replaced decision by oath with decision of the jurors based on the evidence of witnesses; with this change "[T]he party was naturally deemed incapable of being such a witness." 2 Wigmore, p. 682. Incompetency of the parties in civil cases seems to have been established by the end of the sixteenth century. See 9 Holdsworth, History of English Law, p. 194. In time the principal rationale of the rule became the possible untrustworthiness of the party's testimony; for the same reason disqualification was applied in the seventeenth century to interested nonparty witnesses.[2]

Its firm establishment for criminal defendants seems to have come somewhat later. In the sixteenth century it was necessary for an accused to conduct his own defense,

---

[2] Wigmore concludes that "the principle of parties' disqualification would have been the direct root of the disqualification by interest in general." 2 Wigmore, p. 680. "[A]fter Coke's time and probably under the influence of his utterances, the rule for a party was extended by analogy to interested persons in general." Pp. 682–683. Coke listed a number of disqualifications: if the witness "becometh infamous, . . . Or if the witnesse be an infidell, or of non-sane memory, or not of discretion, or a partie interested, or the like." I Coke Upon Littleton, 6. b.

since he was neither allowed to call witnesses in his behalf nor permitted the assistance of counsel. 1 Stephen, History of the Criminal Law of England, p. 350. The criminal trial of this period has been described as "a long argument between the prisoner and the counsel for the Crown, in which they questioned each other and grappled with each other's arguments with the utmost eagerness and closeness of reasoning." Stephen, *supra,* p. 326. In the process the defendant could offer by way of explanation material that would later be characterized as testimony. 2 Wigmore, p. 684. In the seventeenth century, however, he was allowed to call witnesses in his behalf; the right to have them sworn was accorded by statute for treason in 1695 and for all felony in 1701. 7 Will. III, c. 3; 1 Anne, St. 2, c. 9. See Thayer, *supra,* pp. 157–161, and n. 4; 2 Wigmore, pp. 685–686. A distinction was drawn between the accused and his witnesses—they gave evidence but he did not. See 2 Wigmore, pp. 684–685, and n. 42; 9 Holdsworth, *supra,* pp. 195–196. The general acceptance of the interest rationale as a basis for disqualification reinforced this distinction, since the criminal defendant was, of course, *par excellence* an interested witness. "The old common law shuddered at the idea of any person testifying who had the least interest." *State* v. *Barrows,* 76 Me. 401, 409. See *Benson* v. *United States,* 146 U. S. 325, 336–337.

Disqualification for interest was thus extensive in the common law when this Nation was formed. 3 Bl. Comm. 369.[3] Here, as in England, criminal defendants were deemed incompetent as witnesses. In *Rex* v. *Lukens,* 1 Dall. 5, 6, decided in 1762, a Pennsylvania court refused

---

[3] There Blackstone stated the then-settled common-law rule to be that "[a]ll witnesses, of whatever religion or country, that have the use of their reason, are to be received and examined, except such as are *infamous,* or such as are *interested* in the event of the cause."

to swear a defendant as a witness, holding that the issue there in question "must be proved by indifferent witnesses." Georgia by statute adopted the common law of England in 1784, and ". . . the rules of evidence belonging to it . . . [were] in force there . . . ." *Doe* v. *Winn*, 5 Pet. 233, 241. Georgia therefore followed the incompetency rule for criminal defendants long before it was given statutory form by the Act of 1866. See *Jones* v. *State*, 1 Ga. 610; *Roberts* v. *State*, 189 Ga. 36, 40–41, 5 S. E. 2d 340, 343.[4]

Broadside assaults upon the entire structure of disqualifications, particularly the disqualification for interest, were launched early in the nineteenth century in both England and America. Bentham led the movement for reform in England, contending always for rules that would not exclude but would let in the truth. See Rationale of Judicial Evidence, bk. IX, pt. III, c. III (Bowring ed.), pp. 393–406. The basic ground of the attack was, as Macaulay said, that "[A]ll evidence should be taken at what it may be worth, that no consideration which has a tendency to produce conviction in a rational mind should be excluded from the consideration of the tribunals." Lord Macaulay's Legislative Minutes, 1835, pp. 127–128. The qualification in civil cases of nonparty witnesses despite interest came first. See Lord Denman's Act of 1843, 6 & 7 Vict., c. 85. The first general exception in England for party witnesses in civil cases was the County Courts Act of 1846, 9 & 10 Vict., c. 95, although there had

---

[4] By the Act of February 25, 1784, the Georgia Legislature provided that the common laws of England should remain in force in Georgia, "so far as they are not contrary to the constitution, laws, and form of government now established in this State." Prince's Digest (1837), p. 570. Section 3772 of the Code of 1863, which codified the statutory and decisional law of the State, stated: "Witnesses are incompetent . . . Who are interested in the event of the suit."

been earlier grants of capacity in certain other courts. Best, Evidence (Lely ed. 1893), pp. 158–159. Lord Brougham's Act of 1851, 14 & 15 Vict., c. 99, virtually abolished the incompetency of parties in civil cases.[5]

---

[5] The history of the transition in one American jurisdiction is traced in Thayer, A Chapter of Legal History in Massachusetts, 9 Harv. L. Rev. 1. The first American statute removing the disability of interested nonparty witnesses seems to have been Michigan's in 1846, and Connecticut was first to abolish the general incapacity of parties in 1849. The Field reforms in New York State were influential in leading other American jurisdictions to discard the incapacity of both witnesses and parties in civil cases. For an account of the development in the United States, see 2 Wigmore, pp. 686–695.

The preamble to the 1866 Georgia legislation expressed the legislative aim in extending competency: "Whereas, the inquiry after truth in courts of justice is often obstructed by incapacities created by the present law, and it is desirable that full information as to the facts in issue, both in civil and criminal cases, should be laid before the persons who are to decide upon them, and that such persons should exercise their judgment on the *credit* of the witnesses adduced for the truth of testimony." The first section of the Act forbade the exclusion of witnesses, "by reason of incapacity from crime or interest, or from being a party"; it also contained a "dead man's statute" proviso. The remaining sections enumerated the exceptions to the extension of competency; they were in effect a statutory declaration that certain of the common-law incapacities should remain intact. See *Roberts* v. *State*, 189 Ga. 36, 5 S. E. 2d 340; *Wilson* v. *State*, 138 Ga. 489, 492, 75 S. E. 619, 620; *Howard* v. *State*, 94 Ga. 587, 20 S. E. 426. The second section contained the original of § 38–416, stating: "But nothing herein contained shall render any person, who, in any criminal proceeding, is charged with the commission of any indictable offence, or any offence punishable on summary conviction, competent or compellable, to give evidence for or against himself, or herself, or shall render any person compellable to answer any question tending to criminate himself or herself; or shall in any criminal proceeding render any husband competent or compellable to give evidence for or against his wife, or any wife competent or compellable to give evidence for or against her husband; nor shall any attorney be compellable to give evidence for or against his client." Ga. Laws 1866,

The qualification of criminal defendants to give sworn evidence if they wished came last. The first statute was apparently that enacted by Maine in 1859 making defendants competent witnesses in prosecutions for a few crimes. Maine Acts 1859, c. 104. This was followed in Maine in 1864 by the enactment of a general competency statute · for criminal defendants, the first such statute in the English-speaking world. The reform was largely the work of John Appleton of the Supreme Court of Maine, an American disciple of Bentham. Within 20 years most of the States now comprising the Union had followed Maine's lead. A federal statute to the same effect was adopted in 1878, 20 Stat. 30, 18 U. S. C. § 3481. Before the end of the century every State except Georgia had abolished the disqualification.[6]

Common-law jurisdictions outside the United States also long ago abolished the disqualification. This change

---

pp. 138–139. Save for the provision as to the attorney-client privilege, added during the debate in the Georgia Senate, see Senate Journal, Dec. 5, 1866, p. 266, the second section was verbatim the same as § III of Lord Brougham's Act.

[6] The dates on which the general competency statutes of the States were enacted are: Alabama, 1885; Alaska, 1899; Arizona, 1871; Arkansas, 1885; California, 1866; Colorado, 1872; Connecticut, 1867; Delaware, 1893; Florida, 1895; Hawaii, 1876; Idaho, 1875; Illinois, 1874; Indiana, 1873; Iowa, 1878; Kansas, 1871; Kentucky, 1886; Louisiana, 1886; Maine, 1864; Maryland, 1876; Massachusetts, 1866; Michigan, 1881; Minnesota, 1868; Mississippi, 1882; Missouri, 1877; Montana, 1872; Nebraska, 1873; Nevada, 1867; New Hampshire, 1869; New Jersey, 1871; New Mexico, 1880; New York, 1869; North Carolina, 1881; North Dakota, 1879; Ohio, 1867; Oklahoma, 1890; Oregon, 1880; Pennsylvania, 1885; Rhode Island, 1871; South Carolina, 1866; South Dakota, 1879; Tennessee, 1887; Texas, 1889; Utah, 1878; Vermont, 1866; Virginia, 1886; Washington, 1871; West Virginia, 1881; Wisconsin, 1869; Wyoming, 1877.

The current citations to these statutes are collected in the Appendix to this opinion, *post,* p. 596.

came in England with the enactment in 1898 of the Criminal Evidence Act, 61 & 62 Vict., c. 36.[7]  Various States of Australia had enacted competency statutes even before the mother country, as did Canada and New Zealand.  Competency was extended to defendants in Northern Ireland in 1923, in the Republic of Ireland in 1924, and in India in 1955.[8]

The lag in the grant of competency to the criminally accused was attributable in large measure to opposition from those who believed that such a grant threatened erosion of the privilege against self-incrimination and the presumption of innocence.  "[I]f we were to hold that a prisoner offering to make a statement must be sworn in the cause as a witness, it would be difficult to protect his constitutional rights in spite of every caution, and would often lay innocent parties under unjust suspicion where they were honestly silent, and embarrassed and over-

---

[7] Parliament had enacted a number of specialized competency statutes prior to 1898, the first in 1872.  About 25 others had been passed by the time of the enactment of the general competency statute.  See 56 Hansard, Parliamentary Debates, 4th Series, pp. 977–978.  The most important was the Criminal Law Amendment Act of 1885, 48 & 49 Vict., c. 69, which made defendants competent in certain felony prosecutions.  Most of the other statutes involved offenses created by regulatory legislation, which were generally misdemeanors.  See generally Best, *supra,* pp. 571–572; 2 Taylor, Evidence (12th ed.), 862–863.

[8] Canada and New Zealand adopted competency statutes in 1893.  Canada Evidence Act, see Rev. Stat. Can. (1952), c. 307, § 4 (1); New Zealand Criminal Code Act, § 398, see N. Z. Repr. Stat., Evidence Act 1908, § 5.  For an account of the Australian development, see 6 Res Judicatae 60.  The statute in Northern Ireland is the Criminal Evidence Act (Northern Ireland); the Irish statute is the Criminal Justice (Evidence) Act.

For the Indian statute, see Code of Criminal Procedure (Amendment) Act, 1955, § 61, in 42 A. I. Rep. [1955], Indian Acts Section p. 91.

whelmed by the shame of a false accusation. . . . [It would result in] . . . the degradation of our criminal jurisprudence by converting it into an inquisitory system, - from which we have thus far been happily delivered." *People* v. *Thomas,* 9 Mich. 314, 320–321 (concurring opinion). See also *Ruloff* v. *People,* 45 N. Y. 213, 221–222; *People* v. *Tyler,* 36 Cal. 522, 528–530; *State* v. *Cameron,* 40 Vt. 555, 565–566; 1 Am. L. Rev. 443; Maury, Validity of Statutes Authorizing the Accused to Testify, 14 Am. L. Rev. 753.[9]

The position of many who supported competency gave credence to these fears. Neither Bentham nor Appleton was a friend of the privilege against self-incrimination.[10] While Appleton justified competency as a necessary pro-

---

[9] Opposition on this score was marked in Great Britain. Said one member of Parliament in the 1898 debates: "[W]hy is this change to be made in the law? The English Revolution is against it, three centuries of experience is against it; and the only argument adduced in its favor is the suggestion that an honest man is occasionally convicted of a crime of which he is innocent. . . . it would be a degradation to your great judicial tribunals that, though a guilty man may not, an innocent man may be placed in a position of embarrassment and peril—for the first time under the British Constitution—far greater than any ancient law designed." 56 Hansard, *supra,* pp. 1022, 1024. Said another: "[F]or centuries the criminal law of England has been administered on the principle that if you want to hang a man you must hang him on somebody else's evidence. This is a Bill to hang a man on his own evidence . . . ." *Id.,* at 1030. There had been particular opposition on the part of Irish members, who contended that competency would become a means of oppression of defendants there; as a result Ireland was excluded from the coverage of the Act. See 60 Hansard, *supra,* pp. 721–742. Other members were hostile because of fear that the statute would have an adverse effect on laborers who became criminal defendants. See 60 Hansard, *supra,* pp. 546–547, 574–578.

[10] See Bentham, Rationale of Judicial Evidence, bk. IX, pt. IV, c. III, pp. 445–468; Appleton, The Rules of Evidence, pp. 126–134.

tection for the innocent, he also believed that incompetency had served the guilty as a shield and thus disserved the public interest. Competency, he thought, would open the accused to cross-examination and permit an unfavorable inference if he declined to take the stand to exculpate himself.[11]

This controversy left its mark on the laws of many jurisdictions which enacted competency. The majority of the competency statutes of the States forbid comment by the prosecution on the failure of an accused to testify, and provide that no presumption of guilt should arise from his failure to take the stand. The early cases particularly emphasized the importance of such limitations. See, *e. g., Staples* v. *State,* 89 Tenn. 231, 14 S. W. 603; *Price* v. *Commonwealth,* 77 Va. 393; *State* v. *Taylor,* 57 W. Va. 228, 234–235, 50 S. E. 247, 249–250. Cf. 1 Cooley, Constitutional Limitations (8th ed.), pp. 658–661. See generally, Reeder, Comment Upon Failure of Accused to Testify, 31 Mich. L. Rev. 40. For the treatment of the accused as a witness in Canada, see 12 Can. Bar Rev. 519, 13 Can. Bar Rev. 336; in Australia, see 6 Res Judicatae 60; and in Great Britain, see 2 Taylor, Evidence (12th ed.) 864–865; 51 L. Q. Rev. 443; 58 L. Q. Rev. 369.

Experience under the American competency statutes was to change the minds of many who had opposed them. It was seen that the shutting out of his sworn evidence could be positively hurtful to the accused, and that inno-

---

[11] "That then the accused, if *guilty,* should object being placed in an attitude so dangerous to him, *because* he is guilty, is what might have been expected. . . . His objection to testifying, is an objection to punishment." Appleton, *supra,* p. 131. See also *State* v. *Cleaves,* 59 Me. 298; cf. *State* v. *Bartlett,* 55 Me. 200, 215–221. For a note on Appleton's role in the movement to extend competency, see Thayer, A Chapter of Legal History in Massachusetts, 9 Harv. L. Rev. 1, 12. See also 14 Am. L. Reg. 705.

cence was in fact aided, not prejudiced, by the opportunity of the accused to testify under oath. An American commentator discussing the Massachusetts statute in the first year of its operation said: "We have always been of opinion, that the law permitting criminals to testify would aid in the detection of guilt; we are now disposed to think that it will be equally serviceable for the protection of innocence." 1 Am. L. Rev. 396. See also 14 Am. L. Reg. 129.

This experience made a significant impression in England and helped to persuade Parliament to follow the American States and other common-law jurisdictions in granting competency to criminal defendants. In the debates of 1898, the Lord Chancellor quoted a distinguished English jurist, Russell Gurney: "[A]fter what he had seen there [in America], he could not entertain a doubt about the propriety of allowing accused persons to be heard as witnesses on their own behalf." 54 Hansard, *supra,* p. 1176. Arthur Balfour reported to the Commons that "precisely the same doubts and difficulties which beset the legal profession in this country on the suggestion of this change were felt in the United States, but the result of the experiment, which has been extended gradually from State to State, is that all fears have proved illusory, that the legal profession, divided as they were before the change, have now become unanimous in favor of it, and that no section of the community, not even the prisoners at the bar, desire to see any alteration made in the system." 60 Hansard, *supra,* pp. 679–680.[12]

---

[12] For other comments on the impact of the competency statutes, see Alverstone, Recollections of Bar and Bench, pp. 176–180; Biron, Without Prejudice; Impressions of Life and Law, p. 218; Train, The Prisoner at the Bar, pp. 205–211; Sherman, Some Recollections of a Long Life, p. 234; 1933 Scots Law Times 29; 2 Fortnightly L. J. 41.

A particularly striking change of mind was that of the noted authority on the criminal law, Sir James Stephen. Writing in 1863, Stephen opposed the extension of competency to defendants.  He argued that it was inherent that a defendant could not be a real witness: "[I]t is not in human nature to speak the truth under such a pressure as would be brought to bear on the prisoner, and it is not a light thing to institute a system which would almost enforce perjury on every occasion."  A General View of the Criminal Law of England, p. 202.  Competency would put a dangerous discretion in the hands of counsel. "By not calling the prisoner he might expose himself to the imputation of a tacit confession of guilt, by calling him he might expose an innocent man to a cross-examination which might make him look guilty."  *Ibid.*  Allowing questions about prior convictions "would indirectly put the man upon his trial for the whole of his past life." *Id.*, p. 203.  Twenty years later, Stephen, after many years' experience on the criminal bench, was to say: "I am convinced by much experience that questioning, or the power of giving evidence, is a positive assistance, and a highly important one, to innocent men, and I do not see why in the case of the guilty there need be any hardship about it. . . .  A poor and ill-advised man . . . is always liable to misapprehend the true nature of his defence, and might in many cases be saved from the consequences of his own ignorance or misfortune by being questioned as a witness."  1 Stephen, History of the Criminal Law of England, pp. 442, 444.

In sum, decades ago the considered consensus of the English-speaking world came to be that there was no rational justification for prohibiting the sworn testimony of the accused, who above all others may be in a position to meet the prosecution's case.  The development of the unsworn-statement practice was itself a recognition of the harshness of the incompetency rule.  While its origins

antedated the nineteenth century,[13] its strong sponsorship by English judges of that century is explained by their desire for a mitigation of the rigors of that rule.  Baron Alderson said: "I would *never* prevent a prisoner from making a statement, though he has counsel.  He may make any statement he pleases before his counsel addresses the jury, and then his counsel may comment upon that statement as a part of the case.  If it were otherwise, the most monstrous injustice might result to prisoners."  *Reg.* v. *Dyer,* 1 Cox C. C. 113, 114.  See also *Reg.* v. *Malings,* 8 Car. & P. 242; *Reg.* v. *Walkling,* 8 Car. & P. 243; *Reg.* v. *Manzano,* 2 F. & F. 64; *Reg.* v. *Williams,* 1 Cox C. C. 363.  Judge Stephen's sponsorship of the practice was especially influential.  See *Reg.* v. *Doherty,* 16 Cox C. C. 306.  See also *Reg.* v. *Shimmin,* 15 Cox C. C. 122; 60 Hansard, *supra,* p. 657.  It became so well established in England that it was expressly preserved in the Criminal Evidence Act of 1898.[14]

---

[13] The origins probably lie in the necessity for the prisoner to defend himself during the early development of English criminal law.  See p. 573, *supra.*  Even after the defendant was allowed to have witnesses in his behalf in England, he still had no right to be heard by counsel, except for treason, until the act of 1836, and his participation in the trial remained of major importance; as before, "a prisoner was obliged, in the nature of the case, to speak for himself."  *Reg.* v. *Doherty,* 16 Cox C. C. 306, 309.  Although the practice developed in the eighteenth century of allowing counsel to advise the accused during the trial and to cross-examine the Crown's witnesses, counsel was still not permitted to address the jury.  Stephen, *supra,* p. 424.  The defendant continued to do this in his own behalf.  See 1 Chitty, Criminal Law (5th Am. ed.), p. 623; Bentham, *supra,* bk. IX, pt. V, c. III, p. 496.  See generally 26 Austral. L. J. 166.

[14] Criminal Evidence Act, § 1 (h).  Some English judges had sought to curtail the practice after defendants were statutorily accorded full benefit of counsel by the act of 1836, 6 & 7 Will. 4, c. 114.  In *Reg.* v. *Boucher,* 8 Car. & P. 141, Coleridge, J., held that because defense counsel had addressed the jury, the accused could not make a statement.  See also *Reg.* v. *Beard,* 8 Car. & P. 142; *Reg.* v. *Rider,*

584

The practice apparently was followed in this country at common law in a number of States and received statutory recognition in some. Michigan passed the first such statute in 1861; unlike the Georgia statute of 1868, it provided that the prisoner should be subject to cross-examination on his statement. See *People* v. *Thomas*, 9 Mich. 314.[15] The Georgia Supreme Court, in one of the early

8 Car. & P. 539. In *Reg.* v. *Taylor*, 1 F. & F. 535, Byles, J., said that the prisoner or his counsel would be permitted to address the jury, but not both. At least a remnant of this judicial hostility to the statement lingered almost until the time of the grant of competency. See *Reg.* v. *Millhouse*, 15 Cox C. C. 622.

In addition to its statutory preservation in Great Britain, it survives in other common-law jurisdictions recognizing the defendant's competency. *E. g.*, New Zealand, see *Rex* v. *Perry*, [1920] N. Z. L. R. 21; *Kerr* v. *Reg.*, [1953] N. Z. L. R. 75, 28 N. Z. L. J. 305; Australia, see *Rex* v. *McKenna*, [1951] Q. S. R. 299; Ireland, see *People* v. *Riordan*, [1948] I. R. 416, 94 Irish Law Times, Feb. 20, 1960, p. 43, Feb. 27, 1960, p. 49, March 5, 1960, p. 55; South Africa, see *Rex* v. *de Wet*, [1933] S. A. L. R. 68, 64 So. Afr. L. J. 374.

[15] In some States recognizing the statement at common law, the defendant was confined to arguing the law and commenting on the evidence of the witnesses; he could not state facts. See *Ford* v. *State*, 34 Ark. 649; *Wilson* v. *State*, 50 Tenn. 232. In other States, the prisoner appears to have been allowed more latitude. See *People* v. *Lopez*, 2 Edmonds' Sel. Cases 262 (N. Y.). In Massachusetts, the right of a defendant with counsel to make a statement seems to have been recognized only in capital cases. See the historical review in *Commonwealth* v. *Stewart*, 255 Mass. 9, 151 N. E. 74; see also *Commonwealth* v. *McConnell*, 162 Mass. 499, 39 N. E. 107; *Commonwealth* v. *Burrough*, 162 Mass. 513, 39 N. E. 184; *Commonwealth* v. *Dascalakis*, 246 Mass. 12, 32, 140 N. E. 470, 479. For other considerations of the common-law statement, see *State* v. *Taylor*, 57 W. Va. 228, 50 S. E. 247; *Hanoff* v. *State*, 37 Ohio St. 178 (dissenting opinion) 184–185; *O'Loughlin* v. *People*, 90 Colo. 368, 384–385, 10 P. 2d 543, 549; *State* v. *Louviere*, 169 La. 109, 124 So. 188; cf. *Reg.* v. *Rogers*, [1888] 1 B. C. L. R. pt. 2, p. 119. Alabama gave the unsworn statement statutory sanction in 1882. Previously the right had been confined there to an argument on the evidence, *State* v. *McCall*, 4 Ala. 643, but the statute was construed to allow the state-

decisions considering the unsworn-statement statute, stressed the degree of amelioration expected to be realized from the practice, thereby implicitly acknowledging the disadvantages for the defendant of the incompetency rule. The Court emphasized "the broad and liberal purpose which the legislature intended to accomplish. . . . This right granted to the prisoner is a modern innovation upon the criminal jurisprudence of the common law, advancing to a degree hitherto unknown the right of the prisoner *to give his own narrative* of the accusation against him to the jurors, who are permitted to believe it in preference to the sworn testimony of the witnesses." *Coxwell* v. *State,* 66 Ga. 309, 316–317.[16]

But the unsworn statement was recognized almost everywhere else as simply a stopgap solution for the

ment of matters in the nature of evidence. See *Blackburn* v. *State,* 71 Ala. 319; *Chappell* v. *State,* 71 Ala. 322. Wyoming gave a statutory right of unsworn statement in 1869. See *Anderson* v. *State,* 27 Wyo. 345, 196 P. 1047. Florida in 1866 gave the accused in the discretion of the court an opportunity to make a sworn statement on which he could not be cross-examined. This was made an absolute right in 1870. See *Miller* v. *Florida,* 15 Fla. 577. All these States, of course, subsequently made defendants fully competent.

[16] It is doubtful how far the practice had been followed at common law in Georgia. See *Roberts* v. *State,* 189 Ga. 36, 41, 5 S. E. 2d 340, 343. Initially there seems to have been considerable opposition to giving the unsworn statement statutory sanction. The bill that became the predecessor of present § 38–415 was originally tabled in the House and then passed after reconsideration, and was originally defeated in the Senate. See House Journal, Aug. 8, 10, 13, 1868, pp. 158, 160, 173; Senate Journal, Oct. 3, 1868, p. 492. As passed, it provided that in cases of felony the prisoner should have the right to make an unsworn statement; he was not subject to cross-examination on it and the jury was empowered to give it such force as they thought right. Ga. Laws 1868, p. 24. In 1874 the right was extended to all criminal defendants. Ga. Laws 1874, pp. 22–23. In 1879 the jury was explicitly empowered to believe the statement in preference to the sworn testimony, Ga. Laws 1878–1879, pp. 53–54, and the statute took its present form.

serious difficulties for the accused created by the incompetency rule. "The system of allowing a prisoner to make a statement had been introduced as a mere makeshift, by way of mitigating the intolerable hardship which occasionally resulted from the prisoner not being able to speak on his own behalf." 60 Hansard, *supra,* p. 652. "The custom grew up in England out of a spirit of fairness to give an accused, who was otherwise disqualified, an opportunity to tell his story in exculpation." *State* v. *Louviere,* 169 La. 109, 119, 124 So. 188, 192. The abolition of the incompetency rule was therefore held in many jurisdictions also to abolish the unsworn-statement practice. "In such cases the unsworn statement of an accused becomes secondary to his right of testifying under oath and cannot be received." *State* v. *Louviere, supra,* 169 La., at 119, 124 So., at 192. "The privilege was granted to prisoners because they were debarred from giving evidence on oath, and for that reason alone. When the law was changed and the right accorded to them to tell their story on oath as any other witness the reason for making an unsworn statement was removed." *Rex* v. *Krafchenko,* [1914] 17 D. L. R. 244, 250 (Man. K. B.).[17]

Where the practice survives outside America, little value has been attached to it. "If the accused does not elect to call any evidence or to give evidence himself, he very often makes an unsworn statement from the dock.

---

[17] See also *Clarke* v. *State,* 78 Ala. 474; *Harris* v. *State,* 78 Ala. 482; *Hart* v. *State,* 38 Fla. 39, 20 So. 805; *Copeland* v. *State,* 41 Fla. 320, 26 So. 319; *O'Loughlin* v. *People,* 90 Colo. 368, 10 P. 2d 543.

In Wyoming, the defendant had the option to make an unsworn statement even after the grant of competency, since the competency statute expressly preserved the statement. In 1925 the reservation of the right of statement was removed. See *Anderson* v. *State,* 27 Wyo. 345, 196 P. 1047. Massachusetts thus appears to be the only American jurisdiction still explicitly allowing a defendant in some cases to give either sworn testimony or an unsworn statement. See *Commonwealth* v. *Stewart,* 255 Mass. 9, 151 N. E. 74.

It is well understood among lawyers that such a statement has but little evidential value compared with the sworn testimony upon which the accused can be cross-examined . . . ." *Rex* v. *Zware*, [1946] S. A. L. R. 1, 7–8. "How is a jury to understand that it is to take the statement for what it is worth, if it is told that it cannot regard it as evidence (*i. e.*, proof) of the facts alleged?" 68 L. Q. Rev. 463. The unsworn statement "is seldom of much value, since it is generally incoherent and leaves open many doubts which cannot be resolved by cross-examination." 69 L. Q. Rev. 22, 25. "The right of a prisoner to make an unsworn statement from the dock still exists . . . but with greatly discounted value." 1933 Scots Law Times 29. Commentators and judges in jurisdictions with statutory competency have suggested abrogation of the unsworn-statement right. See 94 Irish Law Times, March 5, 1960, p. 56; 68 L. Q. Rev. 463; *Rex* v. *McKenna*, [1951] Q. S. R. 299, 308.

Georgia judges, on occasion, have similarly disparaged the unsworn statement. "Really, in practice it is worth, generally, but little if anything to defendants. I have never known or heard of but one instance where it was supposed that the right had availed anything. It is a boon that brings not much relief." *Bird* v. *State*, 50 Ga. 585, 589. "The statement stands upon a peculiar footing. It is often introduced for the mere purpose of explaining evidence, or as an attempt at mitigation; the accused and his counsel throw it in for what it may happen to be worth and do not rely upon it as a substantive ground of acquittal." *Underwood* v. *State*, 88 Ga. 47, 51, 13 S. E. 856, 858.

The unsworn statement has anomalous characteristics in Georgia practice. It is not treated as evidence or like the testimony of the ordinary sworn witness. "The statement may have the effect of explaining, supporting, weakening or overcoming the evidence, but still it is something

different from the evidence, and to confound one with the other, either explicitly or implicitly, would be confusing and often misleading. . . . The jury are to deal with it on the plane of statement and not on the plane of evidence, and may derive from it such aid as they can in reaching the truth. The law fixes no value upon it; it is a legal blank. The jury may stamp it with such value as they think belongs to it." *Vaughn* v. *State,* 88 Ga. 731, 739, 16 S. E. 64, 66. Because the statement is not evidence, even the charge in the strict terms of the statute favored by the Georgia Supreme Court, see *Garrett* v. *State,* 203 Ga. 756, 765, 48 S. E. 2d 377, 383; *Emmett* v. *State,* 195 Ga. 517, 541, 25 S. E. 2d 9, 23, calls attention to the fact that the defendant is not under oath. Moreover, charge after charge going beyond the terms of the statute has been sustained. Thus in *Garrett* v. *State, supra,* the trial judge instructed that while the defendants were "allowed" to make a statement, "they are not under oath, not subject to cross-examination, and you are authorized to give to their statement just such weight and credit as you think them entitled to receive." In *Emmett* v. *State,* 195 Ga., at 540, 25 S. E. 2d, at 22, the instruction was that the statement might be believed in preference to the sworn testimony "if you see proper to give it that weight and that place and that importance in the trial of this case." In *Douberly* v. *State,* 184 Ga. 573, 575, 192 S. E. 223, 225, the jury were told they might credit the statement "provided they believe it to be true." In *Allen* v. *State,* 194 Ga. 430, 436, 22 S. E. 2d 65, 68, the charge was: "There is no presumption attached to the defendant's statement. No presumption that it is true, nor any presumption that it is not true. In other words, it goes to you without a presumption either for or against him. You have the right to reject the statement entirely if you do not believe it to be true." In many cases the trial judges have been sustained in specifically pointing out

that defendants were not subject to the sanction for perjury with respect to their unsworn statements. "[I]f he failed to tell you the truth, he incurred no penalty by reason of such failure." *Darden* v. *State,* 171 Ga. 160, 161, 155 S. E. 38, 40. "[T]he defendant's statement is not under oath; no penalty is prescribed for making a false statement . . . ." *Klug* v. *State,* 77 Ga. 734, 736. "Surely there can be no wrong in calling the attention of the jury to circumstances which should impair the force of such testimony or which should enable them to give it the weight to which it is entitled." *Poppell* v. *State,* 71 Ga. 276, 278. See also *Grimes* v. *State,* 204 Ga. 854, 51 S. E. 2d 797; *Thurmond* v. *State,* 198 Ga. 410, 31 S. E. 2d 804; *Willingham* v. *State,* 169 Ga. 142, 149 S. E. 887; *Millen* v. *State,* 175 Ga. 283, 165 S. E. 226.

Because it is not evidence, the statement is not a foundation supporting the offer of corroborative evidence. *Chapman* v. *State,* 155 Ga. 393, 117 S. E. 321; *Medlin* v. *State,* 149 Ga. 23, 98 S. E. 551. "The statute is silent as to corroborating the mere statement of the accused, and while it allows the jury to believe it in preference to the sworn testimony, it seems to contemplate that the statement shall compete with sworn testimony single-handed, and not that it shall have the advantage of being reinforced by facts which do not weaken the sworn evidence otherwise than by strengthening the statement opposed to it." *Vaughn* v. *State,* 88 Ga. 731, 736, 16 S. E. 64, 65. Similarly the statement is not an independent basis for authenticating and introducing documents. *Sides* v. *State,* 213 Ga. 482, 99 S. E. 2d 884; see also *Register* v. *State,* 10 Ga. App. 623, 74 S. E. 429. In the absence of a specific request, the trial judge need not charge the law applicable to a defense presented by the statement but not supported in sworn testimony. *Prater* v. *State,* 160 Ga. 138, 143, 127 S. E. 296, 298; *Cofer* v. *State,* 213 Ga. 22, 96 S. E. 2d 601; *Willingham* v. *State,* 169 Ga. 142, 149

S. E. 887; *Holleman* v. *State,* 171 Ga. 200, 154 S. E. 906; *Darby* v. *State,* 79 Ga. 63, 3 S. E. 663. In contrast the trial judge may *sua sponte* instruct the jury to treat the accused's explanation as not presenting a defense in law; "[i]n proper cases the jury may be guarded by a charge from the court against giving the statement an undue effect in favor of the prisoner . . . ." *Underwood* v. *State,* 88 Ga. 47, 51, 13 S. E. 856, 858; *Fry* v. *State,* 81 Ga. 645, 8 S. E. 308.

It is said that an advantage of substance which the defendant may realize from the distinction is that the contents of his statement are not circumscribed by the ordinary exclusionary rules of evidence. *Prater* v. *State,* 160 Ga. 138, 142–147, 127 S. E. 296, 298–300; *Richardson* v. *State,* 3 Ga. App. 313, 59 S. E. 916; *Birdsong* v. *State,* 55 Ga. App. 730, 191 S. E. 277; *Tiget* v. *State,* 110 Ga. 244, 34 S. E. 1023. However, "The prisoner must have some regard to relevancy and the rules of evidence, for it was never intended that in giving his narrative of matters pertaining to his defense he should attempt to get before the jury wholly immaterial facts or attempt to bolster up his unsworn statement by making profert of documents, letters, or the like, which if relevant might be introduced in evidence on proof of their genuineness." *Nero* v. *State,* 126 Ga. 554, 555, 55 S. E. 404. See also *Saunders* v. *State,* 172 Ga. 770, 158 S. E. 791; *Montross* v. *State,* 72 Ga. 261; *Theis* v. *State,* 45 Ga. App. 364, 164 S. E. 456; *Vincent* v. *State,* 153 Ga. 278, 293–294, 112 S. E. 120, 127.

The situations in which the Georgia cases do assimilate the defendant to an ordinary witness emphasize the anomalous nature of the unsworn statement. If he admits relevant facts in his statement the prosecution is relieved of the necessity of proving them by evidence of its own. "The prisoner's admission in open court, made as a part of his statement on the trial, may be treated by

the jury as direct evidence as to the facts." *Hargroves* v. *State,* 179 Ga. 722, 725, 177 S. E. 561, 563. "It is well settled that the statement of a defendant to a jury is a statement made in judicio and is binding on him. Where the defendant makes an admission of a fact in his statement, such admission is direct evidence, and the State need not prove such fact by any other evidence." *Barbour* v. *State,* 66 Ga. App. 498, 499, 18 S. E. 2d 40, 41; *Dumas* v. *State,* 62 Ga. 58. And admissions in a statement will open the door to introduction of prosecution evidence which might otherwise be inadmissible. *McCoy* v. *State,* 124 Ga. 218, 52 S. E. 434. Admissions in a statement at one trial are admissible against the accused in a later trial. *Cady* v. *State,* 198 Ga. 99, 110, 31 S. E. 2d 38, 46; *Dumas* v. *State, supra.* The prosecution may comment on anything he says in the statement. *Frank* v. *State,* 141 Ga. 243, 277, 80 S. E. 1016. Although it has been held that the mere making of a statement does not put the defendant's character in issue, *Doyle* v. *State,* 77 Ga. 513, it is settled that "A defendant's statement may be contradicted by testimony as to the facts it narrates, and his character may be as effectively put in issue by his statement as by witnesses sworn by him for this purpose." *Jackson* v. *State,* 204 Ga. 47, 56, 48 S. E. 2d 864, 870; *Barnes* v. *State,* 24 Ga. App. 372, 100 S. E. 788. The prosecution may introduce rebuttal evidence of alleged false statements. *Johnson* v. *State,* 186 Ga. 324, 197 S. E. 786; *Camp* v. *State,* 179 Ga. 292, 175 S. E. 646; *Morris* v. *State,* 177 Ga. 106, 169 S. E. 495.

Perhaps any adverse consequences resulting from these anomalous characteristics might be in some measure overcome if the defendant could be assured of the opportunity to try to exculpate himself by an explanation delivered in an organized, complete and coherent way. But the Georgia practice puts obstacles in the way of this. He

must deliver a finished and persuasive statement on his first attempt, for he will probably not be permitted to supplement it. Apparently the situation must be most unusual before the exercise by the trial judge of his discretion to refuse to permit the defendant to make a supplemental statement will be set aside. See *Sharp* v. *State,* 111 Ga. 176, 36 S. E. 633; *Jones* v. *State,* 12 Ga. App. 133, 76 S. E. 1070. Even after the State has introduced new evidence to rebut the statement or to supplement its own case, leave to make a supplemental statement has been denied. *Fairfield* v. *State,* 155 Ga. 660, 118 S. E. 395; *Johnson* v. *State,* 120 Ga. 509, 48 S. E. 199; *Knox* v. *State,* 112 Ga. 373, 37 S. E. 416; *Boston* v. *State,* 94 Ga. 590, 21 S. E. 603; *Garmon* v. *State,* 24 Ga. App. 586, 101 S. E. 757. If the subject matter of the supplementary statement originates with counsel and not with the defendant, it has been held that this is sufficient reason to refuse to permit the making of a supplemental statement. *August* v. *State,* 20 Ga. App. 168, 92 S. E. 956. And the defendant who may have a persuasive explanation to give has no effective way of overcoming the possible prejudice from the fact that he may not be subjected to cross-examination without his consent, for he has no right to require cross-examination. *Boyers* v. *State,* 198 Ga. 838, 844–845, 33 S. E. 2d 251, 255–256. Of course, even in jurisdictions which have granted competence to defendants, the prosecution may decline to cross-examine. But at least the defendants in those jurisdictions have had the advantage of having their explanation elicited through direct examination by counsel. In Georgia, however, as was held in this case, counsel may not examine his client on direct examination except in the discretion of the trial judge. The refusal to allow counsel to ask questions rarely seems to be reversible error. See, *e. g., Corbin* v. *State,* 212 Ga. 231, 91 S. E. 2d 764; *Brown* v. *State,* 58 Ga. 212. "This discretion is to be sparingly exercised,

but its exercise will not be controlled except in cases of manifest abuse." *Whitley* v. *State,* 14 Ga. App. 577, 578, 81 S. E. 797. Indeed, even where the defendant has been cross-examined on his statement, it has been held that defense counsel has no right to ask a question, *Lindsay* v. *State,* 138 Ga. 818, 76 S. E. 369. Nor may counsel call the attention of the defendant to a material omission in his statement without permission of the trial court. *Echols* v. *State,* 109 Ga. 508, 34 S. E. 1038; *Clark* v. *State,* 43 Ga. App. 384, 159 S. E. 135.

This survey of the unsworn-statement practice in Georgia supports the conclusion of a Georgia commentator: "The fact is that when the average defendant is placed in the witness chair and told by his counsel or the court that nobody can ask him any questions, and that he may make such statement to the jury as he sees proper in his own defense, he has been set adrift in an uncharted sea with nothing to guide him, with the result that his statement in most cases either does him no good or is positively hurtful." 7 Ga. B. J. 432, 433 (1945).[18]

---

[18] For other Georgia comments on the practice, see 17 Ga. B. J. 120; 15 Ga. B. J. 342; 14 Ga. B. J. 362, 366; 3 Mercer L. Rev. 335; cf. 5 Ga. B. J., Feb. 1943, p. 47. The Georgia Bar Association has in the past supported a proposal in the legislature to make defendants competent. See, *e. g.,* 1952 Ga. Bar Assn. Rep. 31. Recent study of the problem by the Association's Committee on Criminal Law and Procedure resulted in a report recommending against change on grounds that it would "aid the prosecution and conviction of the defendant and would be of no material benefit to any defendant in a criminal case. Those who are on trial for their lives and liberty cannot possibly think and testify as clearly as a disinterested witness, and of course, it is agreed that a shrewd prosecutor could create, by expert cross examination, in the minds of the jury, an unfavorable impression of a defendant." 1957 Ga. Bar Assn. Rep. 182. However, since that time the Committee has twice recommended competency for criminal defendants and has prepared draft legislation for that purpose. See 1960 Ga. Bar Assn. Rep. 109, 115, 116, 119.

594

The tensions of a trial for an accused with life or liberty at stake might alone render him utterly unfit to give his explanation properly and completely. Left without the "guiding hand of counsel," *Powell* v. *Alabama, supra,*

Georgia's adherence to the rule of incompetency of criminal defendants contrasts with the undeviating trend away from exclusion of evidence that has characterized the development of the State's law since the nineteenth century. The Code of 1863 indicates that the limitations on and exceptions to disqualifications in the common law were numerous even before the Act of 1866. See, *e. g.,* §§ 3772 (5), 3779, 3780, 3781, 3782, 3783, 3785, 4563. The Georgia Arbitration Act of 1856 had made the parties competent in arbitration proceedings. See *Golden* v. *Fowler,* 26 Ga. 451, 458. Judge Lumpkin declared: "[A]s jurors have become more capable of exercising their functions intelligently, the Judges both in England and in this country, are struggling constantly to open the door wide as possible . . . to let in all facts calculated to affect the minds of the jury in arriving at a correct conclusion. . . . Truth, common sense, and enlightened reason, alike demand the abolition of all those artificial rules which shut out any fact from the jury, however remotely relevant, or from whatever source derived, which would assist them in coming to a satisfactory verdict." *Johnson* v. *State,* 14 Ga. 55, 61–62.

A policy favoring the reception of evidence has consistently characterized the decisions of the Georgia courts and Acts of the legislature since the 1866 Act. See, *e. g., Blount* v. *Beall,* 95 Ga. 182, 22 S. E. 52; *Myers* v. *Phillips,* 197 Ga. 536, 29 S. E. 2d 700; *Manley* v. *Combs,* 197 Ga. 768, 781–782, 30 S. E. 2d 485, 493–494; *Sisk* v. *State,* 182 Ga. 448, 453, 185 S. E. 777, 781; *Berry* v. *Brunson,* 166 Ga. 523, 531–533, 143 S. E. 761, 765; *Polk* v. *State,* 18 Ga. App. 324, 89 S. E. 437; *Watkins* v. *State,* 19 Ga. App. 234, 91 S. E. 284. The legislature has removed some of the exceptions retained in the 1866 Act. See Ga. Laws 1935, p. 120, allowing parties to testify in breach-of-promise actions. In 1957 the legislature removed the incompetency of a wife to testify for or against her husband. Ga. Laws 1957, p. 53, amending § 38–1604. Ga. Code § 38–101 sums up this policy: "The object of all legal investigation is the discovery of truth. The rules of evidence are framed with a view to this prominent end, seeking alwãys for pure sources and the highest evidence."

Moreover, in the case of defendants jointly tried, Georgia allows one codefendant to testify as a sworn witness for the other, although his testimony may serve to acquit himself if believed. See, *e. g.,*

p. 69, he may fail properly to introduce, or to introduce at all, what may be a perfect defense. ". . . though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." *Ibid.* The treatment accorded the unsworn statement in the Georgia courts increases this peril for the accused. The words of Cooley, J., in his opinion for the Michigan Supreme Court in *Annis* v. *People,* 13 Mich. 511, 519–520, fit his predicament.

> "But to hold that the moment the defendant is placed upon the stand he shall be debarred of all assistance from his counsel, and left to go through his statement as his fears or his embarrassment may enable him, in the face of the consequences which may follow from imperfect or unsatisfactory explanation, would in our opinion be to make, what the statute designed as an important privilege to the accused, a trap into which none but the most cool and self-possessed could place himself with much prospect of coming out unharmed. An innocent man, charged with a heinous offence, and against whom evidence of guilt has been given, is much more likely to be overwhelmed by his situation, and embarrassed, when called upon for explanation, than the offender, who is hardened in guilt; and if he is unlearned, unaccustomed to speak in public assem-

*Staten* v. *State,* 140 Ga. 110, 78 S. E. 766; *Cofer* v. *State,* 163 Ga. 878, 137 S. E. 378. It may even be error in such a situation for the court to treat such testimony as if it were an unsworn statement and to fail to give sufficient emphasis in the charge to the jury as to its effect as evidence. *Staten* v. *State, supra; Burnsed* v. *State,* 14 Ga. App. 832, 82 S. E. 595; *Roberson* v. *State,* 14 Ga. App. 557, 81 S. E. 798; cf. *O'Berry* v. *State,* 153 Ga. 880, 113 S. E. 203. And a defendant is allowed to give sworn testimony as to matters in his trial not going to the issue of his guilt. See *Thomas* v. *State,* 81 Ga. App. 59, 58 S. E. 2d 213.

blies, or to put together his thoughts in consecutive order any where, it will not be surprising if his explanation is incoherent, or if it overlooks important circumstances." [19]

We therefore hold that, in effectuating the provisions of § 38–415, Georgia, consistently with the Fourteenth Amendment, could not, in the context of § 38–416, deny appellant the right to have his counsel question him to elicit his statement. We decide no more than this. Our decision does not turn on the facts that the appellant was tried for a capital offense and was represented by employed counsel. The command of the Fourteenth Amendment also applies in the case of an accused tried for a noncapital offense, or represented by appointed counsel. For otherwise, in Georgia, "the right to be heard by counsel would be of little worth." *Chandler* v. *Fretag,* 348 U. S. 3, 10.

The judgment is reversed and the cause is remanded for proceedings not inconsistent with this opinion.

*Reversed and remanded.*

## APPENDIX TO OPINION OF THE COURT.

Ala. Code, 1940, Tit. 15, § 305.

Alaska Comp. Laws Ann., 1949, § 66–13–53.

Ariz. Rev. Stat. Ann., 1956, § 13–163.

Ark. Stat., 1947, § 43–2016.

Cal. Pen. Code § 1323.5.   See also Cal. Pen. Code § 1323; Cal. Const., Art. I, § 13.

Colo. Rev. Stat. Ann., 1953, § 39–7–15.

Conn. Gen. Stat., 1958, § 54–84.

---

[19] There the Michigan Supreme Court reversed a conviction because the trial judge refused to let counsel remind the defendant that he had omitted a material fact from his unsworn statement. The quoted excerpt immediately follows an observation that the Michigan statute permitting an unsworn statement evidently did not contemplate an ordinary direct examination.

Del. Code Ann., 1953, Tit. 11, § 3501.

Fla. Stat., 1959, § 918.09.

Hawaii Rev. Laws, 1955, § 222–15.

Idaho Code Ann., 1948, § 19–3003.

Ill. Rev. Stat., 1959, c. 38, § 734.

Ind. Ann. Stat., 1956, § 9–1603.

Iowa Code, 1958, § 781.12.   See also Iowa Code § 781.13.

Kan. Gen. Stat. Ann., 1949, § 62–1420.

Ky. Rev. Stat., 1960, § 455.090.

La. Rev. Stat., 1950, § 15.461.   See also La. Rev. Stat. § 15.462.

Me. Rev. Stat. Ann., 1954, c. 148, § 22.

Md. Ann. Code, 1957, Art. 35, § 4.

Mass. Gen. Laws Ann., 1959, c. 233, § 20.

Mich. Comp. Laws, 1948, § 617.64.

Minn. Stat., 1957, § 611.11.

Miss. Code Ann., 1942, § 1691.

Mo. Rev. Stat., 1959, § 546.260.   See also Mo. Rev. Stat. § 546.270.

Mont. Rev. Codes Ann., 1947, § 94–8803.

Neb. Rev. Stat., 1956, § 29–2011.

Nev. Rev. Stat., 1957, § 175.170.   See also Nev. Rev. Stat. § 175.175.

N. H. Rev. Stat. Ann., 1955, § 516.31.   See also N. H. Rev. Stat. Ann. § 516.32.

N. J. Rev. Stat., 1951, § 2A:81–8.

N. M. Stat. Ann., 1953, § 41–12–19.

N. Y. Code Crim. Proc. § 393.

N. C. Gen. Stat., 1953, § 8–54.

N. D. Rev. Code, 1943, § 29–2111.

Ohio Rev. Code Ann., 1953, § 2945.43.

Okla. Stat., 1951, Tit. 22, § 701.

Ore. Rev. Stat., 1953, § 139.310.

Pa. Stat., 1930, Tit. 19, § 681.   See also Pa. Stat., Tit. 19, § 631.

R. I. Gen. Laws Ann., 1956, § 12–17–9.

S. C. Code, 1952, § 26–405.
S. D. Code, 1939, § 34.3633.
Tenn. Code Ann., 1955, § 40–2402. See also Tenn. Code Ann. § 40–2403.
Tex. Code Crim. Proc., 1948, Art. 710.
Utah Code Ann., 1953, § 77–44–5.
Vt. Stat. Ann., 1959, § 13–6601.
Va. Code Ann., 1950, § 19.1–264.
Wash. Rev. Code, 1951, § 10.52.040.
W. Va. Code Ann., 1955, § 5731.
Wis. Stat., 1959, § 325.13.
Wyo. Stat., 1957, § 7–244.

MR. JUSTICE FRANKFURTER's separate opinion for reversing the conviction, in which MR. JUSTICE CLARK joins.

Georgia in 1784 adopted the common law of England, Act of February 25, 1784, Prince's Digest 570 (1837). This adoption included its rules of competency for witnesses, whereby an accused was precluded from being a witness in his own behalf. It is doubtful whether and to what extent the common-law privilege of an accused, barred as a witness, to address the jury prevailed in Georgia, but it is a fair guess that the practice was far less than uniform. See *Roberts* v. *State,* 189 Ga. 36, 41, 5 S. E. 2d 340, 343. While the common-law rigors of incompetency were alleviated by an enactment of 1866 because "the inquiry after truth in courts of justice is often obstructed by incapacities created by the present law," * Georgia retained the incompetency of an accused to testify in his own defense. In 1868, for the first time a statutory provision granted the accused the privilege of making an unsworn statement to the jury. Ga. Laws

---

*Ga. Laws 1866, p. 138.

1868, p. 24. The sum of all this legislative history is that the defendant in a criminal prosecution in Georgia was disqualified as a witness, but was given opportunity to say his say to the jury. These two aspects of the legal situation in which Georgia placed the accused were made consecutive sections of the penal code in 1895, Ga. Code, 1895, §§ 1010, 1011, and have thus remained through their present form as §§ 38–415 and 38–416.

(1) It would seem to be impossible, because essentially meaningless as a matter of reason, to consider the constitutional validity of § 38–415 without impliedly incorporating the Georgia law which renders the defendant incompetent to present testimony in his own behalf under oath. This is not a right-to-counsel case. As the Georgia Supreme Court correctly stated: "The constitutional provisions . . . confer only the right to have counsel perform those duties and take such actions as are permitted by the law; and to require counsel to conform to the rules of practice and procedure, is not a denial of the benefit . . . of counsel." 215 Ga. 117, 119, 109 S. E. 2d 44, 46. What is in controversy here is the adequacy of an inextricably unified scheme of Georgia criminal procedure. The right to make an unsworn statement, provided by § 38–415, is an attempt to ameliorate the harsh consequences of the incompetency rule of the section following. Standing alone, § 38–415 raises no constitutional difficulty. Only when considered in the context of the incompetency provision does it take on meaning. If Georgia may constitutionally altogether bar an accused from establishing his innocence as a witness, it goes beyond its constitutional duty if it allows him to make a speech to the jury whether or not aided by counsel. Alternatively, if § 38–416 is unconstitutional—a legal nullity—a Georgia accused can insist on being sworn as a competent witness, and the privilege also to

make an unsworn statement without benefit of counsel would constitute an additional benefit of which he may or may not choose to avail himself. If, as is the truth, § 38–415 has meaning only when applied in the context of § 38–416's rule of incompetency, surely we are not so imprisoned by any formal rule governing our reviewing power that we cannot consider the two parts of a disseverable, single whole because petitioner has not asked us in terms to review both halves. It is formalism run riot to find that the division into two separate sections of what is organically inseparable may not for reviewing purpose be treated as a single, appealable unit. This Court, of course, determines the scope of its reviewing power over a state court judgment.

(2) But if limitations on our power to review prevent us from considering and ruling upon the constitutionality of the application of Georgia's incompetency law—which alone creates the significant constitutional issue—then I should think that what is left of this mutilation should be dismissed for want of a substantial federal question. Considered *in vacuo,* § 38–415 fails, as has been pointed out, to present any reasonable doubts as to its constitutionality, for it provides only an additional right. If appellant had in fact purposefully chosen not to be a witness, had agreed to the validity of the incompetency provisions, and had intentionally limited his attack to § 38–415 as applied, he would be presenting an issue so abstract that the Court would not, I believe, entertain it.

Perhaps the accused failed to offer himself as a witness because he thought it would be a futile endeavor under settled Georgia law, while the opportunity to have the aid of counsel in making an unsworn statement pursuant to § 38–415 would be a discretionary matter for Georgia judges. Since I cannot assume that appellant purposefully intended to waive his constitutional claim concerning his incompetency—though he may not explicitly have

asserted this claim—I have no difficulty in moving from the Court's oblique recognition of the relevance to this controversy of § 38–416 to the candid determination that that section is unconstitutional.

Mr. Justice Clark, whom Mr. Justice Frankfurter joins, concurring.

Because, as applied by the Georgia court, § 38–415 grants criminal defendants the opportunity to make unsworn statements in their own behalf, but withholds from the same defendants the assistance of their counsel in eliciting perhaps more effective statements, the Court today strikes down that section. It is held to be unconstitutional "in the context of § 38–416" which renders criminal defendants incompetent as witnesses at their own trials. The Court does not, however, treat § 38–416 as anything more substantial than "context," and, while rendering its validity doubtful, fails to pass upon its constitutionality. The Court's hesitancy to reach that question appears to be due to appellant's tactic, at the trial, of offering his statement under § 38–415 and, in so doing, demanding the aid of his counsel, but not offering himself as a competent witness or challenging his exclusion under § 38–416. This has proven to be a perfect cast of appellant's line, for the Court has risen to the bait exactly as anticipated. The resulting advantage of the Court's present holding to the criminal defendant in Georgia is obvious—as matters now stand, the defendant may make an unsworn statement as articulate and convincing as the aid of counsel can evoke, but the prosecution may not cross-examine.

It is true that merely to defeat such a result is insufficient justification for this Court to reach out and decide additional constitutional questions otherwise avoidable. Nevertheless, the problem appellant poses under § 38–415 is so historically and conceptually intertwisted with the

rule of § 38–416 that not only must they be considered together, as the Court expressly recognizes, but they must be allowed to stand or fall together, as a single unitary concept, uncircumscribed by the accident of divisive codification. The section today struck down, § 38–415, is not even intelligible except in terms of the incompetency imposed by § 38–416.* Were the latter rule not codified, its proscription would have to be understood as § 38–415's operative premise of common-law disability. The purported boon of § 38–415 was founded on that disability, against the hardships of which, nowhere else presently imposed, it was intended to at least partially relieve. I would not withhold adjudication because of the fact of codification, nor merely on account of the procedural dodge resorted to by counsel.

Reaching the basic issue of incompetency, as I feel one must, I do not hesitate to state that in my view § 38–416 does not meet the requirements of due process and that, as an unsatisfactory remnant of an age gone by, it must fall as surely as does its palliative, § 38–415. Until such time as criminal defendants are granted competency by the legislature, the void created by rejection of the codified common-law rule of Georgia may be filled by state trial judges who would have to recognize, as secured by the Fourteenth Amendment, the right of a criminal defendant to choose between silence and testifying in his own behalf. In the same manner the state courts presently implement other federal rights secured to the accused, and therefore the fact that a void of local policy would be created is not an insuperable obstacle to the disposition I propose. Nor would past convictions be automatically rendered subject to fatal constitutional attack unless, as

---

*I agree with my Brother FRANKFURTER that if § 38–415 is to be isolated from the incompetency provision of § 38–416, "what is left of this mutilation should be dismissed for want of a substantial federal question."

was, in my view, done here, the proper challenge had been preserved by appropriate objection to active operation of the concept embodied in the incompetency rule in either of its phases. In view of the certain fact that criminal prosecutions will continue to be had in Georgia, and that some defendant, if not appellant himself at his new trial, will demand the right to testify in his own behalf, in strict compliance with the procedural standard adhered to today, we will sooner or later have the question of the validity of § 38–416 back on our doorstep. The result, predictably, will be the same as that reached under § 38–415 today. If that proves in fact to be the Court's future disposition of the claim I anticipate, the stability of interim convictions may well be jeopardized where related constitutional claims are preserved but, perhaps, not pressed. So too, on the reverse side of the coin, there may well be interim convictions where, had defendants been permitted to testify under oath in their own behalf, verdicts of acquittal would have been returned. This Court should not allow the administration of criminal justice to be thus frustrated or unreasonably delayed by such a fragmentation of the critical issue through procedural niceties made solely in the hope of avoiding a controlling decision on a question of the first magnitude.

For these reasons I deem it impractical as well as unwise to withhold for a future date a decision by the Court on the constitutionality of § 38–416.

Disagreeing with the distorted way by which the Court reverses the judgment, I join in its reversal only on the grounds stated here and in the opinion of my Brother FRANKFURTER which I join.